**In re Theodore REEDS, Jr., and Lindsay L. Reeds, Debtors.**

**Kenneth and Pamela MARX, Plaintiffs,**

v.

**Theodore REEDS, Jr. and Lindsay L. Reeds, Defendants.**

Bankruptcy No. 91–02828–C.

Adv. No. 91–0302–C.

United States Bankruptcy Court, N.D. Oklahoma.

Oct. 9, 1992.

J. Michael Morgan, Tulsa, Okl., for plaintiffs.

Mark A. Craige and James R. Hicks, Tulsa, Okl., for defendants.

## MEMORANDUM OPINION

STEPHEN J. COVEY, Chief Judge.

### Procedural Background

This matter comes on to be heard upon the Complaint filed by Kenneth and Pamela Marx, Plaintiffs, objecting to the dischargeability of their debt against Theodore Reeds, Jr. and Lindsay L. Reeds, Debtors. At the hearing, the complaint against Lindsay L. Reeds was dismissed with prejudice. This Court having heard the testimony of the witnesses, having examined the documentary evidence, having heard the arguments of counsel and being fully advised in the premises finds as follows.

### Statement of Facts

In 1980, Kenneth and Pamela Marx ("Marxes") purchased an apartment building in New York City on West 51st Street in the theater district. They operated the building until 1986 when they sold it to the 51st Street Partnership for $443,000.00. They took a first mortgage on the property which was personally guaranteed by the partners, Hill and Carleton. Thereafter, the Marxes moved to northwest Arkansas.

In January 1989, the 51st Street Partnership sought to refinance the property to make improvements on the building by adding two new apartments on the roof. Amalgamated Bank agreed to loan the partnership $550,000.00 to make the improvements provided it received a first mortgage on the property. Carleton approached the Marxes to see if they would agree to subordinate their mortgage to that of the bank. In return, the Marxes would receive a second mortgage on the property and a cash payment of $175,000.00. The Marxes liked the idea of making improvements to the building. They wanted the property to succeed and were confident that the property's value, both before and after the improvements, was sufficient to cover both mortgages.

While discussing the renovation plans, Carleton told the Marxes of the partnership's newest partner, Theodore Reeds, Jr., "Debtor". Debtor was an architect who had been involved with apartment renovations in the New York City area and Carleton spoke highly of him. The Marxes requested a financial statement from Debtor to make sure he was someone with whom they would like to do business.

The financial statement, dated March 16, 1989, portrayed Debtor as a successful businessman. It indicated he lived in an exclusive New Jersey neighborhood; he had a prestigious New York business address; he collected expensive art work; and he saved money. It showed a net worth of $505,000.00. The major component of Debtor's net worth was attributable to the value of Debtor's interest in another apartment building located in New York known as the West 24th Street Property. It is the value of this property which impressed the Marxes the most and on which they allegedly relied in agreeing to subordinate their mortgage to that of the bank.

The West 24th Street Property was listed as having a $3,900,000.00 value with a $2,215,000.00 mortgage. Although not stated in the financial statement, the Marxes knew the Debtor only owned a twenty-two percent interest in this property. To compute his equity in the property, Debtor took twenty-two percent of the $3,900,000.00 value and subtracted from that amount twenty-two percent of the $2,215,000.00 mortgage owed. This left him with an equity of approximately $370,000.00. Thus, $370,000.00 of Debtor's $505,000.00 net worth came from the value attached to the West 24th Street Property.

In truth, the $3,900,000.00 value was based on the property's value upon completion, not upon its present worth. The West 24th Street apartment building was in the process of a $2,000,000.00 renovation whereby its apartment units were being converted into twenty-four condominiums. At the time of the financial statement, it was not completed and none of the condominium units had been sold. The $3,900,000.00 figure was based upon the amount of money to be received upon the completion and the sale over a substantial length of time of all the condominiums. The financial statement reflected a present value of $3,900,000.00 and a equity of the Debtor

in the property of $370,000.00. This was false. As stated above, $3,900,000.00 was not the present value of the property but was only the projected proceeds from the sale of all the units after completion.

The Marxes knew the building did not have a present value of $3,900,000.00 and knew the Debtor's interest was not $370,-000.00. The Marxes made no investigation or inquiry into the actual present value of the property. They knew the building was not completed but had been led to believe, both from oral statements of the partners and from the financial statement, that completion of the building was approximately six weeks away and at that time sales would begin. They had no separate appraisal made of the West 24th Street Property. The only effort the Marxes made to investigate the condition of the property was to have a friend casually go by the property to make sure that it was in fact under construction.

In early April 1989, the Marxes agreed to take a second mortgage on the West 51st Street Property in return for $175,000.00 cash. The new note called for monthly payments of $2,600.00 at a higher interest rate to begin in July 1989. The first check was returned for insufficient funds and the Marxes did not receive any further payments.

Amalgamated Bank eventually foreclosed on the West 51st Street property and there was no money to pay the Marxes' second mortgage. Additionally, the construction on the West 24th Street property was never completed and no condominiums were sold. The property was sold at a foreclosure sale for an amount insufficient to cover the first mortgage. Debtor filed bankruptcy on July 31, 1991.

### Conclusions of Law

The Marxes argue their debt is nondischargeable under Section 523(a)(2)(B), which provides in pertinent part:

(a) A discharge under section 727, ... of this title does not discharge an individual debtor from any debt—

(2) for ... refinancing of credit, to the extent obtained by— ...

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or ...

The Marxes must prove each of these elements by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Because Debtor admits there was a statement in writing regarding his financial condition, it is only elements (i), (iii) and (iv) which are in dispute.

### Materially False

The creditor must show not only that the financial statement was in fact false, but that it was materially false. "Materially false" means the statement must contain not only incorrect or erroneous information but must be substantially inaccurate. *In re Anzman*, 73 B.R. 156 (Bankr.D.Colo.1986); *In re Denenberg*, 37 B.R. 267 (Bankr.D.Mass.1983). In the present case, the evidence establishes that the value of the West 24th Street Property was grossly inflated. It was based on the value to be realized upon completion and sale of the units, not upon its present worth. This in turn caused Debtor's net worth to be overstated. His net worth was listed as $505,000.00 on the statement. However, the major component of this net worth ($370,000.00) was attributable to the overstated value attached to the West 24th Street Property. By overvaluing the real estate, Debtor's net worth appeared much larger than it actually was. Debtor's attempt to justify the valuation—that it is common to value property this way—does not make it any less false. The Court finds the statement was materially false.[1]

---

**1.** There was also much testimony that Debtor overvalued certain antiques and art works and omitted debts from the statement. However, Mrs. Marx testified that she relied principally

## Intent to Deceive

Where the false representation is knowingly or recklessly made, the intent to deceive may be inferred. *In re Lippert*, 84 B.R. 612 (Bankr.D.Minn.1988). In fact, in some instances the shear magnitude of the misrepresentation evidences an intent to deceive. Debtor maintains he did not intend to deceive the Marxes. He stated that property is commonly valued based on its value at completion. He did, however, know the $3,900,000.00 value was false and, therefore, his present interest in the property was not worth $370,000.00. The false value of the real estate substantially inflated his net worth and this Court finds and infers from the magnitude of the falsity Debtor intended to deceive the Marxes or at least acted with a reckless disregard for the truth.

## Reasonable Reliance

The issue of reasonable reliance is divided into two parts. First, there must be actual reliance on the materially false representations and second, this reliance must be reasonable. To establish actual reliance, the creditor must show its reliance on the false financial statement was "a contributory cause of the extension of credit" and "that credit would not have been granted if the lender had received accurate information." *In re Anzman*, 73 B.R. 156, 164 (Bankr.D.Colo.1986) (quoting *In re Coughlin*, 27 B.R. 632, 637 (B.A.P. 1st Cir. 1983).

In this case, the evidence established that Debtor's financial statement did not play a meaningful role in the Marxes' decision to refinance their debt on the West 51st Street property. Rather, the determinative factors were that they received a $175,000.00 cash payment on their debt and a second mortgage on the property which they felt had sufficient value to cover both their mortgage and the bank's.

Even if the Marxes actually relied on the financial statement, they must also prove their reliance was reasonable. The

upon the net worth of Debtor based upon his interest in the West 24th Street Property. In

reasonableness of a creditor's reliance is judged objectively, i.e. that degree of care which would be exercised by a reasonably cautious person in an average business transaction under similar circumstances. *In re Martz*, 88 B.R. 663 (Bankr.E.D.Pa. 1988). In *In re Martz*, the court discussed four instances where courts have held that the reliance was unreasonable.

1. The creditor knows the financial statement is not accurate.

2. The financial statement does not contain adequate information to present an accurate picture of financial condition.

3. The creditor's own investigation suggests the financial statement was false or incomplete.

4. The creditor fails to verify the information.

*In re Martz*, 88 B.R. at 674. *See also In re Lippert*, 84 B.R. 612 (Bankr.D.Minn.1988); *In re Richards*, 71 B.R. 1017 (Bankr. D.Minn.1987).

In the case of *In re Schoeff*, 116 B.R. 119 (Bankr.N.D.Ind.1990) the court stated:

> Whether or not reliance was reasonable is a factually sensitive inquiry.... The inquiry can involve such things as the amount and adequacy of the information given or requested, the nature and circumstances of the loan, the past relationship, if any, between creditor and debtor, the amount of the loan itself, the sophistication of the lender, its normal lending practices and the custom of the industry. (citations omitted).

> \*   \*   \*   \*   \*   \*

> The court is keenly aware of the tensions that exist within § 523(a)(2)(B). Its requirement of reasonable reliance must not become a vehicle by which the courts, having the benefit of 20/20 hindsight, second guess a creditor's loan policies or the wisdom of its lending decisions. At the same time, however, "it is not our business to bail out any lender no matter how recklessly it gives out its money." (citations omitted).

addition, Debtor satisfactorily explained the omission of the debts.

It is not this court's desire to countenance fraud. Neither does the court desire to encourage parties to allow themselves to be defrauded.

If a party blindly trusts, where he should not, and closes his eyes where ordinary diligence requires him to see, he is willingly deceived[.]

\*     \*     \*     \*     \*     \*

"[A] man is bound to use ordinary care and diligence to guard against fraud and imposition, and ... if he fails to do so, he cannot obtain relief from the courts." *Wood v. Wack,* 31 Ind.App. 252, 67 N.E. 562, 564 (1903).... Thus, "a lender must investigate creditworthiness and ferret out ordinary credit information." *[In re ] Ward,* 857 F.2d [1082] at 1084 [ (6th Cir.1988) ]. It may not " 'assume the position of an ostrich with its head in the sand and ignore facts which were readily available to it.' " *[Matter of ] Bogstad,* 779 F.2d [370] at 373 n. 4 [ (7th Cir.1985) ] (quoting *In re Blatz,* 37 B.R. 401, 404–405 (Bankr.E.D.Wis.1984).

Applying these standards to the present case, the Court finds that any reliance by the Marxes on the financial statement of the Debtor was not reasonable. The Marxes knew the value of the West 24th Street Property was based upon the projected sales price of the condominiums after completion. They knew the financial statement did not accurately portray the value of the West 24th Street Property and, therefore, that it was false. The Marxes made no thorough, serious or significant investigation of their own. They did not have a separate appraisal made nor did they have anyone familiar with real estate values in New York or the condominium market investigate the building. Their only effort to check on the information given in the financial statement was to have a friend casually go by the building to make sure it was under construction.

The Marxes cannot be allowed to claim reasonable reliance upon a financial statement they knew to be false particularly where, knowing of the falsehood, they made no investigation of their own. This is a classic case where the Marxes put their head in the sand and are now crying foul. The only explanation for the failure of the Marxes to act as reasonably prudent business people is that they were anxious to receive the $175,000.00, and they felt the balance of their loan was adequately secured by a second mortgage.

The importance of the fresh start policy in bankruptcy must not be underestimated. As discussed by the Supreme Court of the United States in *Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230, 1235 (1934):

One of the primary purposes of the Bankruptcy Act is to relieve the honest debtor from the weight of oppressive indebtedness and permit him to start afresh free from the obligations and responsibilities consequent upon business misfortunes.

\*     \*     \*     \*     \*     \*

This purpose of the act has been again and again emphasized by the courts as being of public as well as private interest, in that it gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns *at the time of bankruptcy,* a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of pre-existing debt.

\*     \*     \*     \*     \*     \*

The power of the individual to earn a living for himself and those dependent upon him is in the nature of a personal liberty quite as much if not more than it is a property right. To preserve its free exercise is of the utmost importance, not only because it is a fundamental private necessity, but because it is a matter of great public concern. From the viewpoint of the wage earner there is little difference between not earning at all and earning wholly for a creditor. Pauperism may be the necessary result of either.

\*     \*     \*     \*     \*     \*

The new opportunity in life and the clear field for future effort, which it is the purpose of the bankruptcy act to

afford the emancipated debtor, would be of little value to the wage earner if he were obliged to face the necessity of devoting the whole or a considerable portion of his earnings for an indefinite time in the future to the payment of indebtedness incurred prior to his bankruptcy.

Although this case involved the validity of a post-petition wage assignment the philosophy expressed applies equally to a discharge objection where there is a large amount of money involved. Exceptions to discharge must be narrowly construed against the creditor and in favor of the debtor in order to carry out the rehabilitative policy of the Bankruptcy Code. *See In re Shervin,* 112 B.R. 724 (Bankr.E.D.Pa. 1990); *In re Schmiel,* 94 B.R. 373 (Bankr. E.D.Pa.1988); *In re Claussen,* 118 B.R. 1009 (Bankr.D.S.D.1990); *In re Fisackerly,* 114 B.R. 145 (Bankr.W.D.Tenn.1990); *In re Grier,* 124 B.R. 229 (Bankr.W.D.Tex.1991); *In re Murray,* 116 B.R. 473 (Bankr.E.D.Va. 1990); *In re Blackwell,* 115 B.R. 86 (Bankr. W.D.Va.1990); *In re Wisniewski,* 109 B.R. 926 (Bankr.E.D.Wis.1990); *In re Pruitt,* 107 B.R. 764 (Bankr.D.Wyo.1989).

The Court will enter a separate order finding the debt of the Marxes against the Debtor is not excepted from the Debtor's discharge pursuant to § 523 of the Bankruptcy Code.