In re Lynn Andrew WARNER, Jr., Debtor.

AMSOUTH FINANCIAL CORP., Plaintiff,

v.

Lynn Andrew WARNER, Jr., Defendant.

Bankruptcy No. 91–32570–D.
Adv. No. 92–0466.

United States Bankruptcy Court,
W.D. Tennessee,
Western Division.

June 16, 1994.

Ellen Vergos, Memphis, TN, for AmSouth.

Norman Hagemeyer, Memphis, TN, for defendant Dr. Warner.

## MEMORANDUM OPINION AND ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY OF DEBT OF AMSOUTH FINANCIAL CORP.

BERNICE BOUIE DONALD,
Bankruptcy Judge.

This core proceeding came on to be heard on the timely-filed complaint of AmSouth Financial Corp. ("AmSouth") seeking to have its debt excepted from the discharge provisions of 11 U.S.C. § 727, and objecting to the debtor's general discharge. The court bifurcated the proceeding and heard only the Section 523 matters in order to consolidate numerous Section 727 complaints. AmSouth relies on 11 U.S.C. § 523(a)(2)(B) for the nondischargeability of its particular debt, alleging that defendant, Dr. Lynn Andrew Warner ("Dr. Warner") obtained money from AmSouth by use of a materially false financial statement which overvalued assets and understated liabilities, all with the intent to induce AmSouth by deceit to make a loan.

The court has jurisdiction in this cause by virtue of 28 U.S.C. §§ 157(b)(2)(I), (J), and 1334. This Memorandum Opinion constitutes the Court's findings of fact and conclusions of law pursuant to F.R.B.P. 7052.

On or about March 2, 1990, Debtor as a partner of D.W.A. Partnership ("D.W.A.") executed a promissory note ("Note") in favor of AmSouth in the principal amount of $450,-000.00. (Trial Ex. 2) This Note replaced a prior promissory note of January 31, 1990, payable to AmSouth. (Trial Ex. 1). On January 31, 1990, for the benefit of D.W.A., Debtor executed a guaranty agreeing to pay all sums due and to become due from D.W.A. (Trial Ex. 3).

As security for the sums advanced to D.W.A., Debtor, in his capacity as a partner of D.W.A., executed a security agreement whereby a Beech King Air E–90 aircraft, serial number LW–120, FAA registration number N99AC (hereinafter "Aircraft"), which had been purchased with the proceeds of the note, was transferred to AmSouth as security for the indebtedness under the note. (Trial Exhs. 4 and 5).

D.W.A. defaulted on said Note and on November 4, 1991, a writ of replevin was executed in Mississippi. (Trial Ex. 7) AmSouth took possession of the Aircraft pursuant to the writ. At the time of repossession, the amount due and owing under the note was $365,000. AmSouth received a conditional offer of purchase for $360,000. (Trial Ex. 8) The aircraft was ultimately sold for $290,000 on an "as is" basis. (Trial Ex. 8) The sales proceeds were applied to the principal balance of the subject loan.

As part of the transaction, on December 5, 1989, Debtor submitted to AmSouth personal financial statements of Debtor and his wife. The financial statements, one dated April 1, 1989, and one dated December 1, 1989, reflected net worth of $2,597,000. The April financial statement reflected projected income of $366,400.[1] The December financial statement reflected projected income of $324,400.[2] Debtor's 1989 tax return reflected gross income of only $110,030.00 [3].

Debtor contends that the projected income figures were based on expectations of what

---

1. See Trial Exhs. 14 and 15.

2. See Trial Ex. 14.

3. See Trial Ex. 25.

the business would do, and represented good faith projections on Debtor's part.

Debtor's December 1989 financial statements showed assets totalling $2,597,000 (Trial Ex. 15). The total included, among other things, the equity in Debtor's home, furniture, fixtures, jewelry, and accounts receivable from Debtor's business operations. Debtor explained that a replacement cost valuation method was used to derive the valuations for furniture and fixtures contained in the financial statements.

Testimony at trial revealed that Debtor's financial statements failed to reflect liabilities to First Citizens Bank in the amount of $400,000,[4] including a mortgage on Defendant's residence. A loan of $50,000 from his profit sharing plan, a line of credit with Jefferson Smurfit on which Debtor was personally liable in the amount of $350,000 and guaranty for obligations of International Business Network in the amount of $200,000, were also omitted.

Debtor explained the omission of these liabilities by stating that with respect to the guaranty, he forgot them since the Corporation entities were liable for these obligations.

Debtor also failed to disclose liens associated with certain assets which had been pledged to First Citizens Bank one month before the subject loans. Debtor allegedly forgot about the existence of these liens.

AmSouth contended and proved at trial that Debtor submitted materially false financial statements in order to induce AmSouth to make loans; that AmSouth reasonably relied on those false financial statements to its detriment; that Defendant's actions were either fraudulent, or grossly negligent or both, and that AmSouth's debts should be excepted from the general discharge provisions of Section 727.

The issues for judicial determination are whether cause exists to except AmSouth's debts from discharge where Debtor submitted false financial statements which overvalued assets, understated some liabilities, and omitted certain other liabilities, whether the financial statements were materially false, whether AmSouth reasonably relied on said financial statements, and whether the same were submitted with an intent to deceive.

### DISCUSSION

11 U.S.C. § 523(a)(2)(B) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

In order to prevail, Plaintiff must show, by a preponderance of the evidence that[5]:

1. the debt was obtained by use of a statement in writing,
2. which statement was materially false,
3. respecting Defendant's financial condition,
4. that Plaintiff reasonably relied on the financial statements; and
5. that Plaintiff submitted the statement with an intent to deceive.

The Plaintiff has the burden of proof in a dischargeability action, and each one of the elements of 523(a)(2)(B) must be proven. Failure to prove any one of the stated elements is fatal to Plaintiff's case.

### Was the Debt Obtained By a Statement in Writing

■ In order to arrange credit from AmSouth for DWA, Debtor executed on or about January 31, 1990, a written guaranty whereby he personally guaranteed payment on de-

4. See Trial Exhs. 14 and 15.

5. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

mand of all sums due and to become due from DWA. (Trial Ex. 3) In connection with the loan, Debtor furnished to AmSouth on or about December 5, 1989, what were represented to be personal written financial statements of Debtor and his wife, Faye Warner, one statement dated April 1, 1989, and one dated December 1, 1989, which reflected a net worth of $2,597,000. His projected income was shown to be $366,400 on his April statement and $324,400 on the December statement.

Thus, the court finds that the debt was obtained by use of a statement in writing.

### Were the Financial Statements Materially False Statement

Both financial statements presented by Debtor to AmSouth were materially false in that they greatly overstated Debtor's assets and understated his liabilities.

Defendant's debt to AmSouth was obtained by the use of two written financial statements, one dated April 1989 (the "April Statement") and the other dated December 1989 (the "December Statement"). See Trial Exhibits 14 and 15. Both statements were prepared by Dr. Warner and his bookkeeper and were furnished to AmSouth for use in determining whether to make a loan to the DWA partnership.

The two financial statements which Dr. Warner submitted to AmSouth were very similar. Both financial statements contained inaccuracies and omissions and portrayed the Debtor as solvent based on a comparison of assets and liabilities. The statements reflected a net worth of $2,597,000. The proof at trial, and based on evidence in the record, showed that Dr. Warner's net worth was substantially less than the $2,597,000 reflected on the statement. Moreover, it appears that Dr. Warner was, and had been for several years, experiencing severe financial difficulties. AmSouth presented a table or chart which illustrated Debtor's misrepresentation of his assets and liabilities.[6]

Dr. Warner stated a value of $30,000 under the title of "Investments" in the December Statement. At trial, Dr. Warner testified that he arrived at that figure more or less by speculating what he deemed the value of various securities to be. In Debtor's wife's deposition, she testified that she sold the same securities for roughly $10,000 in 1991 to pay income taxes.

Dr. Warner valued his Personal Injury Clinic at $40,000 in his December 1989 Statement. He later testified that this amount was actually the undiscounted value of the clinic's accounts receivable. Several months following the issuance of the December Statement to AmSouth, the clinic was merged into Dr. Warner's medical practice (the "P.C."), for no consideration other than the forgiveness of a $5,000 note owing to the P.C.

Further, Dr. Warner placed a value of $200,000 under the heading of "Equity, Debenture, & Loans; Investor's Business Network, Inc." ("I.B.N."). However, Dr. Warner testified that the $200,000 was the amount paid for an investment in the "I.B.N.", not the actual value of his interest in the business. Dr. Warner admitted that the investment at the present time has no value. With respect to an investment known as "Bahamas Box, Ltd.", Debtor appraised its worth at $700,000, again arriving at that figure on the basis of money invested over the years into that company and not the true worth or appraised value of the business. (*See* Trial Ex. 16)

Dr. Warner employed a different methodology for valuing American Nursing Resources, Inc. (A.N.R.). He arrived at a value of $200,000 by multiplying "profit" by three. (Testimony at trial) The 1989 financial statements showed a value of $200,000 for ANR. Dr. Warner reflected a value of $25,000 on the Bankruptcy Schedules. However, the balance sheet of ANR showed stockholders equity of $63,000. Dr. Warner's one-fourth interest would have been approximately $16,000. Dr. Warner also attributes $72,000 as an annual income source from

---

**6.** This table which is attached and incorporated in this opinion as an illustrative device reflects a breakdown of omitted liabilities as to Debtor's financial condition. The figures reflected in the Tables were proven during the trial.

American Nursing Resources on his December 1989 Statement. However, Dr. Warner's 1989 income tax return reflects a gain of just $32,662.[7] These gross over representations of assets can only be viewed as an attempt to misrepresent Dr. Warner's financial status by painting a rosy picture. Since many of the assets were interests in closely held corporations, Dr. Warner was fully aware of the difficulty of independent verification.

Under the heading of "Annual Sources of Income", Dr. Warner represents a total annual income of $324,400 as of December 1, 1989, while his tax return for 1989 reflects total income of only $70,867. One Hundred Thirty Thousand Dollars ($130,000) of total annual income is attributed to "Earnings from Retirement Trust Fund", from contributions from both Dr. Warner and the P.C. Dr. Warner later testified that he did not know, in fact, if contributions to his retirement fund in those amounts had been made.

Lastly, AmSouth contends Dr. Warner overstated the value of his "personal effects." In the December Statement, Warner placed a value of $60,000 for his furnishings and $40,000 for china, jewelry, furs, etc. However, the same household furnishings, etc., were listed in Schedule B of Dr. Warner's bankruptcy petition at one-half their supposed value ($30,000 and $20,000 respectively). Dr. Warner testified that he arrived at the values placed in the December Statement, not by an appraisal or consultation with a specialist, but by his own estimation of their value.

■ By his own admission, the values attributed to the assets listed in Dr. Warner's Financial Statements were made without regard to their true worth, that even if AmSouth cannot show "actual knowledge of falsity" and "conscious intent to deceive," the requisite intent to deceive may be inferred by his total disregard for arriving at the true value of his assets. *In re Batie*, 995 F.2d 85 (6th Cir.1993) *See also, Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly*, 13 B.R. 145, 4 C.B.C.2d 1445 (Bankr.S.D.Fla. 1981).

Dr. Warner also took liberties with respect to the amount of "Liabilities" listed in his Financial Statements. The April financial statement reflected liabilities of $131,000. The total liabilities reflected in the December Statement were $105,000, approximately $26,000 less than what they were in April of that same year. Testimony at trial revealed the existence of more than $1 million of additional liabilities which should have been disclosed. The Bankruptcy Schedules showed 2.1 million in liabilities. At trial, Dr. Warner was unable to satisfactorily explain the failure to include the substantial liabilities. His bookkeeper admitted that the contingent liabilities should have been reflected on the financial statement.

■ A determination of "materiality" must turn upon the financial statement and disclosure with respect to a particular debtor. Accordingly, a determination of "material" must be determined on a case-by-case basis.

■ It is well settled that the omission, concealment, or understatement of liabilities constitutes a materially false statement. *In re Woolum*, 979 F.2d 71 (6th Cir.1992); *In re Liming*, 797 F.2d 895 (10th Cir.1986); *First National City Bank v. Latona*, 260 F.2d 264 (2d Cir.1958); *Kansas Federal Credit Union v. Niemeier*, 227 F.2d 287 (10th Cir.1955); *Trimble v. Chariton and Lucas County National Bank*, 55 F.2d 165 (8th Cir.1932); *Glick v. First National Bank of Columbus*, 53 F.2d 951 (7th Cir.1931). Omission of prior secured loans totalling $100,000 for loan of $10,000 was material. *In re Figge*, 94 B.R. 654 (Bankr.C.D.Cal.1988) ($220,000 the difference between actual value $560,000 and represented value $780,000 was material for loan of $200,000). Overstatement of net worth by at least 7% was material. *In re Meyer*, 89 B.R. 25 (Bankr.E.D.Wisc.1988). *But see In re Roland*, 65 B.R. 1003 (Bankr. D.Conn.1986) where the court held that a $72,000 difference between actual net worth of $206,500 rather than the represented $278,500 was not material for $62,500 loan. A statement may be materially false when the applicant fails to list contingent liabilities. *In re Woolum, supra; In re Bebar*, 315

7. See Trial Ex. 25.

F.Supp. 841 (E.D.N.Y.1970). Clearly, Dr. Warner's unexplainable and unsubstantiated understatement of liabilities also militates in favor of the "materially false" element.

Considering the transactions in their totality, and considering the magnitude of the omitted liabilities, and considering that although Debtor is not an accountant or investment banker, Debtor is highly educated and a sophisticated businessman operating or participating in a number of business ventures, and considering that Debtor had the assistance of a bookkeeper in preparing his financial statements and monitoring his business affairs, the Court finds that the glaring omission rendered the statements materially false. Mr. Smith's bookkeeper, testified that the financial statements were a reasonable reflection of the debtor's affairs. However, in light of the omissions, and material misrepresentations, this Court cannot agree.

Debtor relies on the case of *In re Reeds*, 145 B.R. 703 (Bankr.N.D.Okl.1992) to argue the nonmateriality of the omitted information. This Court finds that the facts in the instant case are distinguishable from *Reeds*. In *Reeds*, the debtor submitted a financial statement which portrayed debtor as a successful businessman. The financial statement showed a net worth of $505,000. The primary component of Debtor's net worth was his interest in a piece of real estate, having a reputed value of $3,900,000, with a $2,215,000 mortgage. In actuality, the $3.9 million value was based on the property's value at completion, not on its present worth. The property was undergoing a $2 million renovation, and the $3.9 million was the amount to be received upon completion of the project, including sales of condominiums over a period of time.

In truth the purported value contained in the financial statement was false. The *Reeds* court found the following facts:

The Marxes knew the building did not have a present value of $3,900,000.00 and knew the Debtor's interest was not $370,-000.00. The Marxes made no investigation or inquiry into the actual present value of the property. They knew the building was not completed but had been led to believe, both from oral statements of the partners

and from the financial statement, that completion of the building was approximately six weeks away and at that time sales would begin. They had no separate appraisal made of the West 24th Street Property. The only effort the Marxes made to investigate the condition of the property was to have a friend casually go by the property to make sure that it was in fact under construction.

*Id.* at 706.

The property was ultimately foreclosed, resulting in a deficiency, and the subject creditor sought a judgment of nondischargeability.

The court concluded:

The issue of reasonable reliance is divided into two parts. First, there must be actual reliance on the materially false representations and second, this reliance must be reasonable. To establish actual reliance, the creditor must show its reliance on the false financial statement was "a contributory cause of the extension of credit" and "that credit would not have been granted if the lender had received accurate information."

In this case, the evidence established that Debtor's financial statement did not play a meaningful role in the Marxes' decision to refinance their debt on the West 51st Street property. Rather, the determinative factors were that they received a $175,000.00 cash payment on their debt and a second mortgage on the property which they felt had sufficient value to cover both their mortgage and the bank's.

Even if the Marxes actually relied on the financial statement, they must also prove their reliance was reasonable. The reasonableness of a creditor's reliance is judged objectively, i.e. that degree of care which would be exercised by a reasonably cautious person in an average business transaction under similar circumstances. [*In re Martz*, 88 B.R. 663 (Bankr.E.D.Pa. 1988)] In *In re Martz*, the court discussed four instances where courts have held that the reliance was unreasonable.

1. The creditor knows the financial statement is not accurate.

2. The financial statement does not contain adequate information to present an accurate picture of financial condition.

3. The creditor's own investigation suggests the financial statement was false or incomplete.

4. The creditor fails to verify the information.

*Id.* at 707 (citations omitted)

Further, the Court in *Reeds,* held:

Applying these standards to the present case, the Court finds that any reliance by the Marxes on the financial statement of the Debtor was not reasonable. The Marxes knew the value of the West 24th Street Property was based upon the projected sales price of the condominiums after completion. They knew the financial statement did not accurately portray the value of the West 24th Street Property and, therefore, that it was false. The Marxes made no thorough, serious or significant investigation of their own. They did not have a separate appraisal made nor did they have anyone familiar with real estate values in New York or the condominium market investigate the building. Their only effort to check on the information given in the financial statement was to have a friend casually go by the building to make sure it was under construction.

The Marxes cannot be allowed to claim reasonable reliance upon a financial statement they knew to be false particularly where, knowing of the falsehood, they made no investigation of their own. This is head in the sand and are now crying foul. The only explanation for the failure of the Marxes to act as reasonably prudent business people is that they were anxious to receive the $175,000.00, and they felt the balance of their loan was adequately secured by a second mortgage.

*Id.* at 708.

This case is so far distinguishable on facts from the case at bar, as to be largely irrelevant, although this Court concurs with its result.

The Sixth Circuit in the case of *In re Woolum,* 979 F.2d 71 (6th Cir.1992), has held that gross recklessness is sufficient to estab-

lish "intent to deceive" within the meaning of statutory exception to discharge for debts for money obtained by materially false financial statement.

### Respecting the Financial Condition of the Debtor

The proof in the record, both testimonial and documentary, attest that the financial statements were submitted on behalf of Dr. and Mrs. Warner personally for purpose of obtaining a loan. This element of the statute is satisfied and the Court so finds.

### Reasonable Reliance

In order to have its claim held nondischargeable, AmSouth must establish that it "reasonably relied" on Debtor's financial statements pursuant to § 523(a)(2)(B)(iii). What is reasonable reliance depends on the relative sophistication of the lender and the circumstances of the transaction. *In re Biedenharn,* 30 B.R. 342 (Bankr.W.D.La. 1983), *In re Reisman,* 149 B.R. 31 (Bankr. S.D.N.Y.1993), *In re Boice,* 149 B.R. 40 (Bankr.S.D.N.Y.1992). Evidence demonstrating that a loan would not have been granted if the creditor had received accurate financial information is sufficient to show reliance. *In re Coughlin,* 27 B.R. 632 (1st Cir., BAP 1983). However, circumstances of the transaction must be examined to determine whether the creditor actually relied on the false financial statement. If the creditor takes a financial statement and a loan application, immediately approves it and lends the debtor money, the creditor will be hard pressed to show reliance on the financial statement in extending credit because it did not bother to check into the statement's representations. *See, In re Jackson,* 32 B.R. 549 (Bankr.E.D.Va.1983). A creditor is not required to make an independent investigation of a debtor's financial statement in order to meet the reasonable reliance requirements of § 523(a)(2)(B). *F and M Marquette National Bank v. Richards,* 71 B.R. 1017, 16 C.B.C.2d 1134 (Bankr.D.Minn.1987).

In the case of *In re Woolum, supra,* the debtor (also a doctor), applied for a bank loan. Prior to approving the loan, the bank requested, among other information, the

debtor's financial statement. The debtor later filed a bankruptcy petition in which he sought to discharge his obligations to the bank. The bank took the position that its debt was nondischargeable on the ground that the debtor had intentionally submitted a false financial statement in that he had failed to list two guaranty obligations as debts or liabilities in the financial statement given to the bank.

With respect to the reliance element of § 523(a)(2)(B)(iii), the Sixth Circuit Court of Appeals opined that once it has been established that the debtor furnished a lender a materially false financial statement, the "reasonable reliance" element cannot be said to be a "rigorous" requirement. *In re Martin*, 761 F.2d 1163 (6th Cir.1985); *See also, In re Garman*, 643 F.2d 1252 (7th Cir.1980) *cert. denied* 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981). The requirement is aimed at creditors acting in bad faith. The creditor need only establish its reliance, in fact, on the financial statement. *Id.* at 1258. *See also, In re Walton*, 158 B.R. 948 (Bankr. N.D.Ohio 1993) (Reasonable reliance on a false financial statement is not a rigorous requirement within the meaning of § 523(a)(2)(B), but rather has to do with the creditors acting in bad faith).

At trial, Jack Hayes, the AmSouth officer responsible for approving the DWA loans, testified that he relied on the financial statements submitted by Dr. Warner in approving the loan, and that if the financial statements had contained the true values of assets, cash flow, and liabilities, AmSouth would not have extended financing to the DWA partnership. Debtor argues that there was no such reliance, as Hayes independently, without presenting the loan to a loan committee, approved the $450,000 loan. This fact goes to lending policies of the Bank, and does not tend to bear on the issue of AmSouth reliance on the financial statement. Courts must deal with the facts in the record and base its decision on whether the court would have granted the loan.

Based on the testimony at trial and the record as a whole, as to the quantum of proof, the Court finds that plaintiff has carried its burden of proof on the issue of reasonable reliance by a preponderance of the evidence.

### Intent to Deceive

■ The final element which AmSouth must prove in order to have Dr. Warner's debt declared nondischargeable is that Dr. Warner caused his financial statements to be made or published with the intent to deceive. 11 U.S.C. § 523(a)(2)(B)(iv). AmSouth must prove Dr. Warner's statement were knowingly false *or made so recklessly as to warrant a finding that he acted fraudulently. See, In re Batie, supra; In re Martin, supra; In re Matera*, 592 F.2d 378 (7th Cir.1979); *Third National Bank v. Schatten*, 81 F.2d 538 (6th Cir.1936).

In *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Kimberly*, 13 B.R. 145, 4 C.B.C.2d 1445 (Bank.S.D.Fla.1981), the court held that the requisite intent to deceive was imputed to the debtor where, when questioned as to each of the figures on the statement, the debtor responded, "I don't know where I got it." The court stated that the debtor's representations were materially false and made with such reckless disregard of the truth that the requisite intent to deceive may be imputed. *See, Batie, supra. See also, In re Coughlin*, 27 B.R. 632 (1st Cir., BAP, 1983); *In re Matera*, 592 F.2d 378 (7th Cir.1979).

■ Moreover, a debtor's unsupported assertions of an honest intent will not overcome the natural inferences from admitted facts. *See, e.g., In the Matter of Moran*, 456 F.2d 1030 (3d Cir.1972), *cert. denied* 409 U.S. 872, 93 S.Ct. 201, 34 L.Ed.2d 123, rehearing denied, 409 U.S. 1050, 93 S.Ct. 534, 34 L.Ed.2d 504 (1972). Actual knowledge of falsity and conscious intent to deceive are not necessary, intent may be inferred where the debtor made no effort to verify facts stated and had no reasonable grounds to believe that the facts were correct. *Woolen Corp. of America v. Gitnig*, 33 F.2d 259 (3d Cir.1929).

■ Debtor has testified that he made no effort to verify the values which he attributed to various assets, and that most values were made on the basis of his own speculation, without appraisal or consultation with professionals. Standing alone the valuations are

not enough to deny dischargeability since the very nature of valuation is subjective. However, the fact that several of Dr. Warner's business ventures experienced negative cash flows shortly following the extension of the loan from AmSouth coupled with the substantial material omission of significant liabilities supports the inference of the requisite recklessness/fraudulent intent by Dr. Warner. Recklessness in submitting a financial statement known to be false satisfies the "intent to deceive" element of 523(a)(2)(B)(iv). *In re Batie*, 995 F.2d 85 (6th Cir.1993).

### CONCLUSION

Thus based on all the foregoing, the Court finds that AmSouth has carried its burden of proof of the § 523(a)(2)(B) issue by a preponderance of the evidence. AmSouth has shown that the Debtor obtained money by use of a statement in writing that was materially false respecting the debtor's financial condition on which AmSouth reasonably relied, and that the debtor submitted the statement with an intent to deceive AmSouth about its financial condition, or that Debtor's action in grossly understating liabilities was so reckless as to be tantamount to an intent to deceive.

The Court grants a nondischargeable judgment in favor of AmSouth in the principal amount of $75,000 plus interest. The Court has jurisdiction to award a monetary judgment in this cause. The Sixth Circuit Court of Appeals held that determination of the dischargeability of a debt is a core matter. If the court determines the debt to be nondischargeable, the court may proceed to determine the merits of the underlying claim. *In re McLaren*, 990 F.2d 850 (6th Cir.1993).

The underlying contract provided for attorney fees and costs should AmSouth be required to take legal measures to collect its debt. The Court will reserve the issue of the amount for attorney fees and costs pending submission by AmSouth of an application for fees, and expenses, and a hearing on notice.

**IT IS SO ORDERED.**