### In re F.D. SANSOM, Debtor.

### FIRST NATIONAL BANK OF CENTERVILLE, TENNESSEE, Plaintiff,

v.

### F.D. SANSOM, Defendant.

Bankruptcy No. 94–06440.
Adversary No. 94–0454A.

United States Bankruptcy Court,
M.D. Tennessee.

Aug. 25, 1998.

---

Neal Lovlace, Centerville, TN, for plaintiff.

Paul E. Jennings, Jennings & Ramer, P.C., Nashville, TN, for defendant.

## Memorandum

GEORGE C. PAINE, II, Chief Judge.

This matter is before the court on the adversary complaint filed by First National Bank ("FNB") against Farris D. Sansom ("Debtor") seeking to find a $206,347.81 prepetition judgment nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(B).[1] The issue was first before the court on summary judgment motions. The court held that FNB was collaterally estopped from challenging the state court's findings that the debtor did not intend to defraud the bank. FNB appealed and the Sixth Circuit reversed the summary judgment decision of this court finding that if the debtor was grossly reckless in submitting false information, then the debt would be nondischargeable. After a full trial on the merits, the court took the matter under advisement. For the reasons hereinafter stated, the court finds that the debt is dischargeable pursuant to § 523(a)(2)(B).

Unusual does not even begin to describe the financial transaction in this case. In the early 1980's the debtor became acquainted with a man named Sammy McCaleb. Sammy McCaleb and his son Robert McCaleb, owned a sawmill known as McCaleb Lumber. When Sammy McCaleb passed away, the business, although still a going concern, was hampered by the lengthy probate of Mr. McCaleb's estate. FNB held a secured note signed by Sammy McCaleb, his wife, Robert McCaleb and his wife.

Robert McCaleb approached FNB about how he could get his father's estate, his mother, and his wife off of the note. Mrs. Bates, a loan officer at FNB, informed Mr. McCaleb that the only method of removing the other parties from the note was to provide additional collateral or to get another qualified co-signor. Robert McCaleb then

---

1. In the prepetition state court trial on this matter, a jury found that the debtor made a representation to FNB as to a past or existing fact; that the representation was false; that the debtor either knew the representation was false when made or he was reckless as to the truth or falsity; but that the debtor did not intend to deceive FNB.

approached the debtor about becoming a co-signor on the note for McCaleb Lumber.

McCaleb promised the debtor that it would be a ninety-day note, and the debtor agreed to sign the note. The debtor received no interest in the business. He was not an officer, and was uninvolved in the operation of the business. He received no financial remuneration from McCaleb Lumber and he received no stock in the company. The debtor testified that he was simply trying to assist a friend in need. Mr. McCaleb confirmed this motive in his testimony at the trial of this matter in state court.

Mrs. Bates testified that McCaleb presented the debtor as a potential co-signor at FNB, but informed her that the debtor was unwilling to sign a personal financial statement until he was accepted as a co-signor. Mrs. Bates brought this potential deal to the board at FNB. The board accepted the debtor as a new co-signor. McCaleb then delivered the 90-day note to the debtor who signed the note in March of 1985. At the time of the note, the debtor testified that he had no banking relationship with FNB. He filled out no personal financial statement, and no one from the bank called to discuss the transaction with him.

McCaleb was unable to pay off the note in 90 days as promised. Six months later McCaleb and the debtor signed a renewal note for a period of ten years. Again, McCaleb brought the documents to the debtor for his signature and no one from FNB contacted him about the transaction. According to the debtor, no personal financial statement was required at that time.

In February of 1986, the debtor testified that McCaleb requested that he fill out a personal financial statement for the bank. At that time, the debtor submitted a financial statement representing that he had a personal net worth of $431,828. These assets included $78,000 cash on hand, $143,000 in notes receivables, $10,000 in stocks, $158,500 in real estate, $18,000 in automobiles, $25,000 in furniture and miscellaneous and $8,000 in other assets. The only items challenged by FNB as inaccurate are the debtor's stated interests in the cash (in the form of certificates of deposit) and his primary residence.[2]

Between 1985 and 1989, the debtor testified that he spoke with McCaleb infrequently, and that he remained uninvolved in the operation of the business. In 1989, however, McCaleb informed the debtor that he had filed bankruptcy. McCaleb assured the debtor that he had arranged a "friendly foreclosure" with FNB. At this point, the debtor, who had hidden this entire transaction from his wife, confessed his financial difficulties to her.

Mrs. Sansom's self-described reaction was anger. She was so enraged that she went to First American National Bank, without the debtor's knowledge, and had their two certificates of deposit, which had been in Mr. or Mrs. Sansom's name, placed in her name only. She did not inform the debtor of this transaction and he remained unaware of this transaction for several years. Mrs. Sansom also had a quitclaim deed to their marital residence prepared. Some two weeks after learning of the debtor's "friendly" business deal, the debtor quitclaimed the house to his wife.

The friendly foreclosure with FNB proceeded as planned. The debtor and McCaleb purchased the sawmill at the foreclosure signing new notes with FNB in the amount of $150,000. Also in June of 1989, the debtor and McCaleb and signed another note for $12,000 to fund operation of the sawmill. A third note was signed on December 8, 1990 in the amount of $10,096.62 also to fund operations. Few if any payments were ever made on these new obligations.

By the time of the foreclosure sale, the debtor had become acquainted with FNB. Mrs. Bates testified by this time, the debtor was considered to be the primary lender because of McCaleb's bankruptcy. Despite this assertion, FNB made nothing more than a cursory review of the assets in the debtor's

---

2. From as early as February 1986, the debtor never indicated he was a co-maker on the FNB notes on the personal financial statements. If the bank was relying on the statements to provide an accurate portrayal of net worth, then it surely would have insisted upon the inclusion of this liability.

personal financial statement at the time of the foreclosure sale.[3] The personal finance statement on file with the bank at the time of the foreclosure and operational notes indicates the debtor had a net worth of $439,100. The marital real property was listed as $160,000 asset in the debtor's name only. The amount of cash on hand, the certificates of deposit, was $97,000.

In October 1991, FNB filed a state court action against McCaleb and Sansom alleging that the debtor had provided false financial statements to the bank to induce it to extend credit from 1985 until 1989. The first financial statement submitted by the debtor was in February 1986.[4] The debtor kept a copy of that statement and resubmitted financial statements based on that original statement with minor changes on the following dates indicating the following net worth:

| March 1, 1987 | $451,300 |
| March 1, 1988 | $464,300 |
| April 19, 1989 | $439,100 |
| May 15, 1990 | $435,000 |
| October 1, 1990 | $435,000 [5] |

3. Following the initial submission of the debtor's personal finance statement, Mrs. Bates testified that she called First American National Bank to verify the existence of the debtor's certificates of deposit. She did not enquire about the account holders on those certificates of deposit but only if those accounts did in fact exist.

4. FNB alleges that the debtor submitted a personal financial statement in March of 1985. However, due to the bank's policy of purging credit files every three years, that personal financial statement was unable to be located. The debtor testified that he did not submit a personal financial statement until February of 1986. The court found the debtor to be a credible witness.

5. Of course, these net worth figures did not include the debtor's liability to FNB. FNB never requested that the debtor amend his financial statements to reflect his contingent liability as a co-maker.

The personal finance statements were in connection with the following loans and extensions of credit:

| June 14, 1989 | $150,000 |
| December 11, 1989 | |
| June 9, 1990 | |
| December 8, 1990 | |

| June 19, 1989 | $12,000 |
| September 18, 1989 | |
| March 19, 1990 | |
| September 17, 1990 | |

The state court action resulted in a $206,347.81 judgment against the debtor.[6]

According to FNB, the debtor falsely represented that he was the sole interest holder in the marital residence and falsely mislead the bank that he had an interest in two certificates of deposit at First American National Bank valued at between $75,000 and $123,000. No other entries on the debtor's personal financial statement were called into question before this court. The bank argues that these were material misrepresentations made with an intent to deceive FNB and that FNB reasonably relied upon these materially false items when it loaned and extended credit to this debtor.

The debtor argues that he did unintentionally misrepresent his interest in the marital residence and the certificates of deposit. Any false statements were not made with intent to deceive, and the bank could not have reasonably relied upon such statements.[7] Given the remand instructions of

| December 8, 1990 | $10,096.62 |

6. The jury found as follows in the special interrogatories:

3. Did Farris D. Sansom make a representation to The First National Bank as to a past or existing fact?
ANSWER: Yes—(x) No—( )
4. If yes, was the representation false?
ANSWER: Yes—(x) No—( )
5. If yes, did Farris D. Sansom either know the representation was false when he made it or did he make the representation recklessly without knowing whether it was true .or false?
ANSWER: Yes—(x) No—( )
6. Did Farris D. Sansom make the representation with an intent to defraud The First National Bank? In other words, Sansom must have made the representation for the purpose of inducing The First National Bank to rely upon it and to act or to refrain from acting in reliance thereon?
ANSWER: Yes—( ) No—(x)
9. Was the First National Bank damaged as a result of its reliance upon the truth or the representation:
ANSWER: Yes—( ) No—(x)

7. The Sixth Circuit's opinion found that collateral estoppel was inappropriate in this case. The elements of fraud in Tennessee, as set forth by the Sixth Circuit opinion are as follows:

(1) the defendant made a representation as to a past or existing fact

the Sixth Circuit, the court considered the facts of this case with an eye toward each particular element of § 523(a)(2)(B).

Section 523(a)(2)(B) denies a discharge:

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

. . .

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive;

11 U.S.C. § 523(a)(2)(B) (West, 1998). This section deals specifically with false financial statements. There is no dispute in this case that the statement of the debtor were in writing or that certain such statements were concerning the debtor's financial condition and were false. The court therefore, will confine itself to consideration of whether the statements made by the debtor were "materially" false, whether the debtor intended to deceive the bank, either intentionally or recklessly, and whether the bank reasonably relied upon such representations.

▮▮▮ A materially false statement has been defined as:

(2) the representation was false
(3) the representation was in regard to a material fact
(4) the representation was made knowingly or with belief in its truth, or recklessly
(5) the plaintiff reasonably relied on the representation; and
(6) the plaintiff suffered damages as a result.

*In re Sansom*, 1998 WL 57307 (6th Cir. Feb. 2, 1998) (citing *In re Bursack*, 163 B.R. 302, 305 (Bankr.M.D.Tenn.1994)). In order to establish nondischargeability of a debt, the same elements are applicable, save two. Under federal bankruptcy law, recklessness will suffice to establish intent in a nondischargeability action and there is no proximate causation requirement. Because the special interrogatories submitted to the jury during the state court law suit were inconsistent as to whether the defendant acted recklessly, the

one that contains an important or substantial untruth. The measuring stick of material falsity is whether the financial institution would have made the loan if the debtor's true financial condition had been known.

*Fleming Companies v. Eckert (In re Eckert)*, 221 B.R. 40, 44 (Bankr.S.D.Fla.1998) (citing *In re Stratton*, 140 B.R. 720, 722 (Bankr. N.D.Ill.1992)). Whether FNB would have actually denied credit based on the untruth is immaterial. The court must look to whether the objective lending institution would have most likely denied the extended credit had it known the truth. *In re Cohn*, 54 F.3d 1108 (3d Cir.1995). However, the failure to list, concealment or understatement of assets or liabilities is ordinarily a misstatement considered "material." *In re Poskanzer*, 143 B.R. 991 (Bankr.D.N.J.1992).

In this case, the debtor listed himself as the only interest holder in his primary residence, and listed himself as the only interest holder in two certificates of deposit approximating $123,000 at their height. In actuality, he had no ownership interest in the marital residence or the certificates of deposit after 1989. The court finds these false statements were materially false pursuant to § 523(a)(2)(B)(i).

▮▮▮ Section 523(a)(2)(B)(iii) requires that FNB must not have only relied upon the misrepresentations but also that such reliance was reasonable. What is reasonable depends upon the relative sophistication of the lender and the circumstances of the

court reconsidered that issue at the trial on this matter. There is no indication in the jury's special interrogatories whether FNB reasonably relied on the debtor's materially false representations. Furthermore, the state court judgment states that FNB relied upon the representations of the debtor and "was justified in relying on the representation." Justifiable reliance is not the same standard as reasonable reliance. *See Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) (holding justifiable reliance is a lesser standard than reasonable reliance).

Collateral estoppel can be appropriately applied to whether the misstatements were made in writing, whether such were materially false and whether such were as to a past or existing fact. Therefore, in an abundance of caution, the court will reconsider § 523(a)(2)(B)(i), (iii) and (iv). Section 523(a)(2)(B)(ii) is uncontested.

transaction. *AmSouth Financial Corp. v. Warner (In re Warner)*, 169 B.R. 155 (Bankr.W.D.Tenn.1994). While proof that the lender would not have made the loan had the debtor provided accurate financial information is sufficient to show reliance, there was no such showing in this case, and furthermore the creditor must have actually relied on the information supplied in order to assert that reliance was even reasonable. *Id.* at 161.

According to the Sixth Circuit, there are two components to the reliance element in a § 5523(a)(2)(B) action: actual reliance and reasonable reliance. *In re Woolum*, 979 F.2d 71, 75–76 (6th Cir.1992), *cert. denied*, 507 U.S. 1005, 113 S.Ct. 1645, 123 L.Ed.2d 267 (1993). In this case, FNB must show that it actually relied upon the materially false statements of the debtor, and that such reliance was reasonable. The court finds that the bank did not establish actual reliance. But even if FNB had shown actual reliance, its reliance could not have been reasonable.

■ Reasonableness operates to bar a discharge only where the creditor's reliance was so unreasonable as to negate the existence of actual reliance. Reasonable reliance is not a rigorous standard. *Matter of Garman*, 643 F.2d 1252, 1258 (7th Cir.1980), *cert. denied*, 450 U.S. 910, 101 S.Ct. 1347, 67 L.Ed.2d 333 (1981); *In re Martin*, 761 F.2d 1163 (6th Cir.1985). The requirement is aimed at preventing creditors who have acted in bad faith from denying otherwise deserving debtors a discharge. *Id.* However, the statute is directed at creditors who never actually examined the financial statements as well as those who purposely solicit false financial statements. *See In re Warner*, 169 B.R. at 161; *Bomis v. National Union Fire Ins. Co.*, 1994 WL 201885 (6th Cir. May 23, 1994).[8]

■ Reasonableness is determined by a totality of circumstances. Some relevant considerations of this inquiry might be as follows:

1. Existence of prior business dealings between the parties;
2. Whether any warnings would have alerted a reasonably prudent person to the debtor's misrepresentations;
3. Whether minimal investigation would have uncovered the inaccuracies; and
4. The creditor's standards for evaluating creditworthiness and the standards or customs in the industry.

4 LAWRENCE P. KING, COLLIER ON BANKRUPTCY ¶ 523.08[2][d] (15th ed.1998).

■ The initial loan was made in March 1985. No personal financial statement was provided to FNB at that time. No attempt was made to investigate the debtor or even to contact him. The renewal note which was signed six months later also involved no contact between FNB and the debtor. No personal financial statement was required. FNB cannot assert that it relied upon financial statements that did not yet exist.

The first financial statement known to exist is in February 1986. At that time, the debtor misrepresented that he was the sole owner of his real estate and the certificates of deposit. In fact, these assets were owned jointly with the debtor's wife. The total value of these two assets were $257,000. The amount of the loan was $150,219.59. The debtor's total net worth, including the house and certificates of deposit was represented to be $431,828. If the debtor had properly listed the $257,000 in joint assets, there remained $174,828 in assets on this $150,000 loan on which the debtor was a co-signor with McCaleb.

The financial statements submitted by the debtor throughout the subsequent years were virtually identical to the February 1989 statement. The amount of cash in the certificates of deposit increased, and the value of the real estate was occasionally adjusted as

---

8. The Sixth Circuit in *In re Martin*, 761 F.2d 1163 (6th Cir.1985) recognized that Congress was not just concerned with bad faith creditors. Congress was, however, concerned that creditors use, when feasible, "other sources of financial information, such as credit bureau reports, to verify the accuracy of the list of debts."
*Martin*, 761 F.2d at 1166 (quoting from H.R.Rep. No. 595, 95th Cong., Sess. At 130 reprinted in 1978 U.S.Code Cong. & Ad. News 5963, 6091.)

was the amount of the debtor's yearly income. Although the bank challenged the certificates of deposit as an inaccurate listing by the debtor, the court sees that asset as a "wash." The proof was absolutely uncontroverted from Mrs. Sansom that she transferred that asset out of the debtor's name without his knowledge. If he was misrepresenting his interest in this asset, it was because he was unaware that he no longer held that asset. The court finds this misrepresentation to be of no fault of the debtor's.

The investigation of the debtor's assets was virtually nonexistent. Mrs. Bates testified that she called First American to inquire about the certificates of deposit. She asked only if the certificates of deposit existed. She did not ask in whose name they were held. Mrs. Bates also testified that she was aware that the debtor was married at the time of the financial statement. Yet there was no discussion about including Mrs. Sansom on the notes or what if any of the assets listed also belonged to Mrs. Sansom. The bank provided no evidence that it even minimally inquired into debtor's holdings, including the marital home.

 While a creditor is not required to make an independent investigation of the debtor's financial statement in order to meet the reasonableness requirement, that creditor may not rest on its laurels by allowing an extension of credit simultaneously with accepting the financial data. *See In re Warner*, 169 B.R. at 161.[9] In this case, the debtor was granted the loan without reliance by the bank on any personal statement. Credit was further extended without any investigation of the financial information supplied by the debtor after the loan was made. FNB is simply unable to demonstrate to this court that it actually relied on any information supplied by the debtor at the time of the

loan. Furthermore, FNB is unable to show that it reasonably relied on the personal financial statements to extend credit if such reliance existed at all on those personal financial statements.[10]

There were no prior dealings between the debtor and FNB at the time of the original note. The debtor's business relationship with FNB did not materialize until the "friendly foreclosure" in 1989. At that point, the bank conducted no investigation into the debtor's assets, even though the bank asserts that the debtor became their "primary borrower" following McCaleb's bankruptcy. The debtor's failure to include his contingent liability as a co-maker prior to foreclosure, and failure to list the business as an asset and the debt to FNB as a liability following foreclosure, would have caused a reasonably prudent lending institution to at least question the accuracy of the financial statement. Finally, minimal investigation would have revealed these financial inaccuracies. The court is not convinced that FNB actually relied on this financial data for the approval of the loans or the further extensions of credit. If FNB did actually rely, such reliance was not reasonable pursuant to § 523(a)(2)(B)(iii).

 Even if the bank's reliance were reasonable, the court nonetheless finds that the debtor did not act knowingly or so recklessly as to warrant a finding that the debtor defrauded FNB. Under § 523(a)(2)(B)(iv), FNB must demonstrate that the debtor intended the statements to be false or the statement was grossly reckless as to its truth. *In re Martin*, 761 F.2d 1163, 1168 (6th Cir.1985). In this circuit, therefore, if the debtor is grossly reckless when submitting financial statements that he knows are not true or if he possesses a subjective intent

---

9. The bankruptcy court in *Warner* stated as follows:

 If the creditor takes a financial statement and a loan application and immediately approves it and lends the debtor money, the creditor will be hard pressed to show reliance on the financial statement in extending credit because it did not bother to check into the statements['] representations.

 *Warner*, 169 B.R. at 161 (citing *In re Jackson*, 32 B.R. 549 (Bankr.E.D.Va.1983)).

10. Following the "friendly foreclosure," the debtor failed to list the sawmill as an asset or the debt to FNB as a liability. FNB never even questioned this. The failure to include the business as an asset and the debt to FNB as a liability surely should have raised an eyebrow if the financial statements were being relied upon as accurate.

to deceive, then the debt is nondischargeable. *In re Batie*, 995 F.2d 85, 90 (6th Cir.1993).[11]

The jury in the state court found that the debtor did not act with an intent to defraud the bank. This court agrees. The only remaining inquiry, therefore, is whether the debtor was grossly reckless in submitting the financial statement to FNB with the incorrect notation of his interest in the martial residence valued between $138,00 and $168,000 between 1985 and 1990.[12]

The debtor testified that he simply copied the information from one financial year to the next making very few changes.[13] When asked why he did not truthfully indicate his lack of ownership in the marital residence, the debtor answered that he did not know.[14] As far as the debtor's business acumen goes, the court will characterize it as "not the sharpest pencil in the drawer." Here is a man that signed a financial obligation that gave him absolutely nothing in return. He acted, to his extreme detriment, in the name of friendship. The court found his testimony to be extremely credible. It was clear from his testimony that his business dealings either were incredibly generous or needing a pencil sharpener. His misrepresentations were materially false, but not done with a flagrant disregard for the rights of others a

---

**11.** The standard of "gross recklessness" has never been clearly defined in the § 523(a)(2)(B)(iv) context. The Sixth Circuit in *In re Martin* cited two other circuit decisions in support of the term's meaning. Specifically, in *Martin*, the Sixth Circuit stated as follows:

[I]f the debtor either intended to deceive the Bank or acted with gross recklessness, full discharge will be denied.

*Martin*, 761 F.2d at 1167 (citing *In re Matera v. Matera*, 592 F.2d 378, 380 (7th Cir.1979)) (per curiam) and *In re Houtman*, 568 F.2d 651, 655–56 (9th Cir.1978). The Seventh Circuit in *Matera* stated as follows as to the exact standard:

[T]he bankruptcy must have obtained the money or property through representations known to be false or made with reckless disregard for the truth amount to willful misrepresentation.

*Matera*, 592 F.2d at 380. The Ninth Circuit in *Houtman* explained the standard as follows:

We recognize that exceptions to dischargeability are to be strictly construed *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915). A canon of interpretation adjuring strictness is not, however, a justification for abandoning good sense. It makes good sense to hold that either actual knowledge of the falsity of a statement, or reckless disregard for its truth, satisfies the scienter requirement for nondischargeability of a debt under § 17(a)(2). We so hold.

*Houtman*, 568 F.2d at 655–56.

Strangely, the relied upon decisions do not contain the term "gross" as a qualifier for the reckless conduct. The term "gross" is defined in Black's Law Dictionary as follows:

**Gross.** Great, culpable, general; absolute..... Out of all measure; beyond allowance; flagrant; shameful; as a gross dereliction of duty, a gross injustice, gross carelessness or negligence.

Black's Law Dictionary 662 (5th ed.1979). In Tennessee, gross negligence is more than ordinary want of care. Gross negligence is not characterized by inadvertence. It is a negligent act done with utter unconcern for the safety of others, or one done with such reckless disregard for the rights of others that a conscious indifference to the consequences is implied in law. *Sumner v. United States*, 794 F.Supp. 1358 (M.D.Tenn. 1992); *Kennedy v. Perry*, 688 S.W.2d 74 (Tenn. App.1984).

"Gross recklessness" appears to be a term of art with only minimal use outside the bankruptcy arena. Despite the term's use since the Sixth Circuit opinion in *Martin*, it has not been defined. For purposes of this opinion, the court will assume that the recklessness standard includes the qualifier "gross" to mean flagrant, indicating mental attitude of the debtor that would be the evidentiary equivalent of intent to deceive.

**12.** As previously noted, the court does not find the incorrect information provided about the certificates of deposit to be an important consideration. As far as the debtor knew, he still had an ownership interest in the certificates of deposit. The value of the debtor's house in February of 1986 was listed at $162,000 in March of 1987 and changed varying as much as $27,500 from year to year. Despite this change in value, no investigation was made into the asset. This is further indication that FNB was simply not relying on these financial statements.

**13.** In fact, the October 1, 1990 personal financial statement was filled out by FNB by copying from the previous year's statement. The debtor signed it after it was completed. Even with the bank filling out the financial information, the sawmill as an asset and the co-maker liability of the debtor, are not included on the statement. FNB was aware, therefore, that the debtor's net worth was not accurately reflected in the financial statements.

**14.** From 1986 until 1989, the debtor inaccurately stated that he held the marital property in his name only. From 1989 forward, after he quitclaimed the house to his wife, he incorrectly indicated that he had any interest in the home at all.

conscious indifference as to the consequences. The court finds the inaccuracies in the financial statement, in light of the credibility of the debtor, to be best characterized as inadvertent.

The court finds that although the debtor was not truthful as to the house, his actions were not grossly reckless or even reckless. The debtor may not have had an interest in the house valued between $132,500 and $162,000, but he did have more than $170,000 in other assets that were unquestioned by FNB before this court. The debtor considered himself a "silent co-signor" on these notes until the foreclosure in 1989. At that point, the debtor, although equally liable with McCaleb still considered his role to be secondary. The court simply cannot find that the debtor intended to defraud the bank or that he acted with gross recklessness. Furthermore, the reliance, if any did in fact exist, by FNB on the debtor's personal financial statements was not reasonable reliance.

At the summary judgment hearing on this matter the court was puzzled by the jury's finding that the debtor knowingly or recklessly made a false representation to the bank, but that he did not act with intent to defraud, and that FNB was not damaged. However, after hearing all of the proof in this case, the jury's findings make perfect sense. The debtor did present a false financial statement to FNB, but he did not intend to deceive the bank and FNB did not reasonably rely upon the statements it received. The allegedly contradictory jury findings are completely compatible given the proof in this case.

Accordingly, the court finds in favor of the debtor in this § 523(a)(2)(B) action. FNB was unable to carry its burden of proof as to § 523(a)(2)(B)(iii) and (iv).

It is, THEREFORE, so ordered.