25 F.3d 1047
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
 Janis BOMIS, Debtor-Appellant,
v.
NATIONAL UNION FIRE INSURANCE CO., Creditor-Appellee.
 No. 93-1014.
 United States Court of Appeals, Sixth Circuit.
 May 23, 1994.
 
 Before: MARTIN, BATCHELDER, Circuit Judges, and CELEBREZZE, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 In October of 1987, Janis Bomis, the debtor, filed a Chapter XIII petition with the United States Bankruptcy Court for the Eastern District of Michigan. In November of 1990, Bomis filed a Chapter VII petition in the same court. On May 28, 1991, National Union Fire Insurance Company, the creditor, filed its complaint seeking to have Bomis's debt to National Union declared nondischargeable. National Union cited 11 U.S.C. Sec. 523(a)(2)(B),[1] which creates an exception to dischargeability when the debtor submits a false, written financial statement for the purpose of inducing the credit. Under Sec. 523(a)(2)(B), the creditor must have reasonably relied on the statement in extending the credit.
 
 
 2
 On June 30 and July 1, 1992, trial on the issue of dischargeability was held in the bankruptcy court. The bankruptcy court issued an opinion from the bench in which it denied National Union relief because of National Union's failure to prove reasonable reliance. On appeal, the United States District Court for the Eastern District of Michigan reversed the decision of the bankruptcy court as clearly erroneous and found the debt to be nondischargeable. We affirm.
 
 
 3
 * In February, 1984, National Union issued a financial guarantee bond to Bomis, guaranteeing Bomis's promissory note[2] executed in partial consideration for a limited partnership interest in Clarion Hotel Associates. In exchange, Bomis signed an Indemnification and Pledge Agreement in which Bomis promised to repay National Union for any loss or expense incurred by National Union due to Bomis's default on the promissory note.
 
 
 4
 Bomis also completed a "Purchaser Questionnaire" for the purpose of inducing the issuance of the bond. In one section, the questionnaire solicits information necessary to determining whether the applicant is an "accredited investor." An investor qualifies for accredited status if he meets one of two thresholds: (1) the $200,000 Income Test ("the income test") or (2) the $1,000,000 Net Worth Test ("the net worth test"). Bomis put a check mark next to the net worth test, but left blank the space beside the income test, indicating that Bomis believed himself to qualify for accredited investor status through his net worth only.
 
 
 5
 In the questionnaire, Bomis represented his individual adjusted gross income for the years 1982 and 1983, excluding the earnings of his wife, to be $100,000 and $120,000, respectively. Bomis listed his taxable income for those years, again excluding his wife, to be $85,000 and $110,000, respectively. He estimated his taxable income for 1984 would reach $200,000. At trial, the evidence showed Bomis's income to have been $46,784.17 in 1982 and $62,213.90 in 1983.
 
 
 6
 Bomis also represented his net worth to be $1,235,000, based upon $1,250,000 in assets and $15,000 in liabilities. The assets listed by Bomis included $400,000 in limited partnership interests and $750,000 in closely-held securities. The trial revealed that Bomis had little reason to believe these valuations were correct; his most current information on the assets' values came about eight years before he filled out the purchaser questionnaire.
 
 
 7
 At trial, National Union called Patricia Stack as a witness. Ms. Stack was one of two National Union underwriters assigned to screen the three hundred or so purchaser questionnaires of potential investors in the Clarion deal. She had no recollection of Bomis's questionnaire, but estimated that there was a fifty to seventy-five percent chance she, and not the other underwriter, reviewed Bomis's questionnaire. Specifically, Ms. Stack testified that, according to normal business practices, National Union would have relied only on the income detailed by Bomis on the questionnaire, not on the net worth information. Further, Ms. Stack testified that absent Bomis's misrepresentations of income, National Union would not have issued him the bond.
 
 
 8
 The bankruptcy court delivered its opinion from the bench. First, the bankruptcy court noted that Bomis did not purport to qualify for accredited investor status through his income. Turning to the net worth listing, the bankruptcy court concluded that "[i]f anyone was reckless, it was National Union," citing the illiquid assets as an enormous red flag. Second, the bankruptcy court chastised National Union for relying on Bomis's representations of his income without requesting tax returns as verification. Then the bankruptcy court observed that by the standards to which Ms. Stack testified, Bomis's representations of his income only barely approached the threshold ratio of income to debt accepted by National Union. On these grounds, the bankruptcy court held that "[r]eliance was not reasonable, not in this court, not today."
 
 
 9
 On appeal, the district court reversed the bankruptcy court's decision. The district court held that National Union had demonstrated actual reliance even though Ms. Stack had no personal recollection of processing Bomis's questionnaire. The district court also maintained that creditors have no general duty to verify financial statements independently where the statement contains no apparent inconsistencies. The district court perceived no "red flags" on Bomis's purchaser questionnaire and thus refused to deem unreasonable National Union's failure, to request Bomis's tax returns. Moreover, the opinion reasons, even if the illiquidity of Bomis's assets was a "red flag," reliance was reasonable because National Union considered the income representations only, not the net worth listing.
 
 
 10
 The bankruptcy court made no findings as to the other three elements of Sec. 523(a)(2)(B): material falsity, pertinence to the debtor's financial condition, or intent to deceive. The district court made findings in National Union's favor as to each of the three remaining elements of Sec. 523(a)(2)(B). Bomis challenges only the district court's finding on reliance.
 
 II
 
 11
 In appeals from district court reviews of bankruptcy court decisions, the circuit court independently reviews the decision of the bankruptcy court. In re Century Boat, 986 F.2d 154, 156 (6th Cir.1993). The standard for reviewing a bankruptcy court's factual findings in Sec. 523(a)(2)(B) cases is the "clearly erroneous" standard. In re Woolum, 979 F.2d 71, 75 (6th Cir.1992), cert. denied, 113 S.Ct. 1645 (1993); Knoxville Teachers Credit Union v. Parkey, 790 F.2d 490, 491 (6th Cir.1986). Exceptions to dischargeability are to be construed narrowly in favor of the debtor. In re Huffman, 45 B.R. 590, 595 (Bankr.N.D.Ohio 1984). Therefore, the creditor seeking a finding of non-dischargeability bears the burden of proof under Sec. 523(a)(2)(B) by a preponderance of the evidence. Grogan v. Garner, 498 U.S. 279, 111 S.Ct. 654 (1991).[3]
 
 
 12
 The reliance element of a Sec. 523(a) claim has two components: actual reliance and reasonable reliance. See Woolum, 979 F.2d at 75-76. The actual reliance component of Sec. 523(a)(2)(B) reliance may be disposed of quickly. Through the testimony of its underwriter, Patricia Stack, National Union demonstrated actual reliance by a preponderance of the evidence. Ms. Stack's testimony to National Union's normal business practices, plus her personal involvement with the Clarion deal, sufficed to prove National Union actually relied on Bomis's financial statement[4] in issuing the bond.
 
 
 13
 The remaining question is whether or not National Union reasonably relied on Bomis's financial statement. Bomis argues that National Union's reliance was unreasonable because National Union failed to investigate the financial statement. According to Bomis, the duty to investigate is not a general one; whether the duty exists depends upon the circumstances. In this case, the circumstances which together gave rise to the duty to investigate were these: (1) the illiquidity of the Debtor's assets; (2) Bomis's unwillingness to represent himself as qualifying under the income test; and (3) the fact that National Union and Bomis had had no prior dealings.
 
 
 14
 National Union submits that the requirement of reasonable reliance simply screens out creditors who knowingly solicit false financial statements to set up exceptions to dischargeability. For two reasons, National Union argues, its failure to investigate is not fatal. First, the Sixth Circuit does not recognize a duty to investigate in the absence of apparent inconsistencies on the face of the statement, or "red flags." Second, the purported red flags on Bomis's financial statement pertained to an SEC regulation and were irrelevant to National Union's decision to issue the bond.
 
 
 15
 Neither party paints an entirely accurate picture of the relationship in the Sixth Circuit between reasonable reliance and the duty to investigate. Bomis disregards the axiom that the reasonableness requirement is not a rigorous one. "The creditor need establish only its reliance in fact, although its claims to reliance cannot be so unreasonable as to defeat a finding of reliance in fact." Matter of Garman, 643 F.2d 1252, 1258 (7th Cir.1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1347 (1981); see also Knoxville Teachers, 790 F.2d at 492. In other words, the reasonableness requirement operates to bar non-dischargeability only where the creditor's asserted reliance was so unreasonable as to negate the existence of actual reliance. See In re Ledford, 970 F.2d 1556, 1560 (6th Cir.1992), cert. denied, 113 S.Ct. 1272 (1993). As National Union points out, the purpose is to screen out creditors who file for nondischargeability in bad faith. However, we note that this purpose includes creditors who never actually looked at the statement, as well as creditors who knowingly solicit false financial statements.
 
 
 16
 Both National Union and the district court misapprehend the nature of the duty to investigate in this Circuit. Contrary to National Union's assertions, the Sixth Circuit has neither wholly rejected the duty to investigate, nor carved out a single, narrow exception for red flags. As support for its contentions, National Union cites two cases central to Sixth Circuit jurisprudence on the issue of nondischargeability: In re Ledford, 970 F.2d 1556 (6th Cir.1992), cert. denied, 113 S.Ct. 1272 (1993), and Matter of Garman, 643 F.2d 1252 (7th Cir.1980), cert. denied, 450 U.S. 910, 101 S.Ct. 1347 (1981).[5] As Bomis correctly surmises, however, these cases establish that the existence of a duty to investigate depends heavily on the circumstances--circumstances including, but not limited to, red flags.
 
 
 17
 In Ledford, this Court concluded that the debtor was "reading too much into the 'reasonableness' requirement" by contending that the bank's failure to make any independent inquiry rendered its reliance unreasonable. 970 F.2d at 1559. We went on to explain that the creditor's failure to investigate was not unreasonable in that instance because minimal investigation would not have revealed the fraud by the debtor and because the lender and borrower had a prior business relationship. Id. at 1561. Ledford is thus not a wholesale rejection of the obligation to investigate. It reflects a judgment that under the circumstances, the lender should not be penalized for relying on the debtor's representations.
 
 
 18
 National Union cites Garman for the proposition that creditors need not conduct independent investigations in order to prove reasonable reliance. It is true that in Garman the Seventh Circuit refused to impose a general duty of investigation; however, the court did not suggest that the failure to investigate is never unreasonable. The court concluded that under the circumstances before it, the failure to investigate was not unreasonable because the debtor was a long-time customer of the bank, there were no red flags, and further investigation would not have revealed the debtor's fraud. 643 F.2d at 1259. The Garman panel concluded, "Absent any facts reasonably indicating verification was necessary, we are not persuaded that the [creditor's] failure to verify rendered its reliance so unreasonable as to discharge Garman's debt." Id. at 1260 (emphasis added); see also In re Martin, 761 F.2d 1163, 1166-67 (6th Cir.1985) (reasonableness of the investigation should be determined in light of all the facts and circumstances).
 
 
 19
 In re Branham, 126 B.R. 283, 292 (Bankr.S.D.Ohio 1991), cited by National Union, clearly holds that the failure to investigate is never unreasonable, absent patent inaccuracies (red flags) or actual knowledge that the representations were false. National Union implies that this Court affirmed the merits of the Branham decision. In fact, this Court affirmed the district court's dismissal of the Branham appeal because the debtor did not timely file. 953 F.2d 644 (6th Cir.1992). Branham is not persuasive authority.[6]
 
 
 20
 Thus, in the Sixth Circuit, the reasonableness of the creditor's decision not to investigate depends on the circumstances generally thought most relevant to the reasonableness inquiry.[7] The Ledford panel set forth the most common of those factors:
 
 
 21
 (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) whether even minimal investigation would have revealed the inaccuracy of the debtor's representations.
 
 
 22
 Ledford, 970 F.2d at 1560.
 
 
 23
 Here, the financial statement was provided, not for the purposes of obtaining a loan, but to obtain a financial guarantee bond, guaranteeing a promissory note executed in partial consideration for an interest in a limited partnership. The financial statement was one of several hundred processed contemporaneously by National Union relative to the issuance of this bond, which guaranteed payments due under Bomis's note as well as the notes of the other principals. Minimal investigation such as a credit bureau inquiry would not have revealed the falsity of Bomis's claims regarding the value of his assets, and in any event, National Union did not rely on those assets in making its decision to guarantee Bomis's note. The face of this financial statement contains no inconsistencies sufficient to constitute red flags which would require National Union to verify the information independently rather than to rely on Bomis's warranty that the information contained in the statement was true and correct.
 
 III
 
 24
 For the foregoing reasons, we conclude that the bankruptcy court clearly erred in finding National Union's reliance unreasonable. Accordingly, we affirm the judgment of the district court in favor of National Union Fire Insurance Company.
 
 
 
 [1]
 In relevant part, that section reads,
 (a) A discharge under Sec. 727, 141,, [sic] 1228(a), 1228(b) or 1328(b) of this title does not discharge an individual debtor from any debt--
 ....
 (2) for money, property, services, or an extension, renewal, or refinance of credit, to the extent obtained by--
 ....
 (B) use of a statement in writing--
 (i) that is materially false;
 (ii) respecting the debtor's or an insider's financial condition;
 (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
 (iv) that the debtor caused to be made or published with intent to deceive....
 ....
 11 U.S.C. Sec. 523(a)(2)(B).
 
 
 [2]
 The promissory note was for $95,000. Pursuant to a stipulation and order of settlement obtained in the Southern District of New York, a default judgment was issued in National Union's favor in the amount of $113,407.44
 
 
 [3]
 Prior to this Supreme Court decision, the burden of proof on creditors in Sec. 523 cases was "clear and convincing evidence." See In re Branham, 126 B.R. 283, 287 (Bankr.S.D.Ohio 1991), aff'd on procedural grounds, 953 F.2d 644 (6th Cir.1992). The Grogan decision came down January 15, 1991, four months before National Union filed this complaint
 
 
 [4]
 As noted above, Bomis does not contest the district court's finding that the purchaser questionnaire was a written statement regarding his financial condition
 
 
 [5]
 The Sixth Circuit has adopted the reasoning of Garman in cases involving Sec. 523(a)(2)(B). See, e.g., In re Phillips, 804 F.2d 930, 933 (6th Cir.1986)
 
 
 [6]
 We note that in an unpublished opinion a panel of this Court affirmed a decision of the bankruptcy court which held that a creditor may assume a financial statement is accurate when it is complete and consistent. See In re Myers, 961 F.2d 1577 (6th Cir.1992), aff'g 124 B.R. 735 (Bankr.S.D.Ohio 1991). The Myers panel, however, affirmed the bankruptcy court decision on the reasoning of the district court rather than the bankruptcy court and, unfortunately, the district court opinion is neither published nor reported on-line
 
 
 [7]
 In re Ward, 857 F.2d 1082 (6th Cir.1988), does not present contrary authority. Ward ostensibly creates a requirement that banks run credit checks on potential debtors: "A lender must investigate creditworthiness and ferret out ordinary credit information." Id. at 1084. Later cases, including the district court opinion below, have limited Ward to its facts. See Ledford, 970 F.2d at 1560-61; cf. In re Steinbrunner, 149 B.R. 484 (Bankr.N.D.Ohio 1992) (extending Ward slightly beyond its facts); In re Torres, 139 B.R. 659 (Bankr.N.D.Ohio 1991) (same)