In re Thomas A. GREEN, Debtor.

FirstMerit Bank, N.A., fka First National Bank of Ohio, Plaintiff,

v.

Thomas A. Green, Defendant.

Bankruptcy No. 99–10421.
Adversary No. 99–1185.

United States Bankruptcy Court, N.D. Ohio.

Nov. 18, 1999.

Robert M. Stefancin, Robert B. Trattner, Browse & McDowell, Akron, OH, for Plaintiff.

Stephen D. Hobt, Cleveland, OH, for Defendant-Debtor.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

### Background

FirstMerit Bank, N.A. ("FirstMerit") filed this adversary proceeding to have its $88,000 claim against the Debtor declared nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code (11 U.S.C. §§ 101–1330). This is a core proceeding under 28 U.S.C. § 157(b)(2)(I). This opinion embodies the Court's findings of fact and conclusions of law in accordance with Fed. R.Bankr.P. 7052.

### Facts

The Debtor, Thomas Green, and his brother Ralph Green were the sole shareholders in Green Enterprises, Inc., a corporation which operated a photo finishing business in Cleveland under the name Midtown Imaging ("Imaging"). In early 1996 James Brindza, a FirstMerit loan officer, approached the Debtor on a referral from Imaging's accountant with a view to becoming Imaging's lender. Brindza specialized in financing closely held businesses like Imaging. Shortly after their meeting Debtor sent Brindza Imaging's financial statements in anticipation of FirstMerit's refinancing of Imaging's existing bank debt and providing it funds to acquire necessary equipment. As part of the financing, FirstMerit required Imaging's owners to guarantee FirstMerit's loans to Imaging. On or about March 27, 1996, the Debtor furnished Brindza two personal financial statements ("PFS") on forms provided by FirstMerit, one signed by Ralph Green and the other signed by the Debtor and his wife Cynthia. Ralph Green's PFS showed a net worth of $240,329. The Debtor's PFS showed $445,700 as the couple's net worth.

FirstMerit had authorized Brindza to approve loans of less than $200,000 without loan committee or other authorization, and it appears that Brindza analyzed Imaging's creditworthiness and approved FirstMerit's loans to Imaging substantially on his own. The loans to Imaging were documented and closed in early April, 1996. They provided Imaging a line of credit and a term loan, both secured by security interests in Imaging's assets and guaranteed by Ralph Green and the Debtor (the "Imaging Loans").

Subsequently, Imaging experienced financial and business problems and ceased to do business. The Debtor also encountered personal financial problems and filed this chapter 7 case on January 21, 1999. FirstMerit filed a claim against the Debtor pursuant to his guarantee for the balance owing on the Imaging Loans. FirstMerit contends in this adversary proceeding that its claim is nondischargeable under § 523(a)(2)(B) because the Debtor's PFS was erroneous and fraudulent in that it listed bank and money market accounts (the "Bank Accounts") of $101,700 and real estate (the "Real Estate") worth $80,000 as joint assets when they were in fact held by

Cynthia Green alone. Debtor does not dispute the fact that title to the Real Estate and Bank Accounts was in Cynthia Green's name, but argues that this does not justify a finding of nondischargeability. The factual elements of this dispute are so intertwined with the analysis of § 523(a)(2)(B) that they are further developed in the course of that analysis.

### Analysis

■■■ Section 523(a)(2)(B) provides in relevant part that:

A discharge under section 727 ... does not discharge an individual debtor from any debt ...

(2) for money ... to the extent obtained by—...

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive.

FirstMerit has the burden of proving each of these elements by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). Debtor admits that the Real Estate and Bank Accounts were held solely in Cynthia Green's name and that, to that extent, his PFS was erroneous but argues, in effect, that the error was immaterial.

In an important respect the question of the materiality of the Debtor's misstatement in his PFS anticipates the question of FirstMerit's reliance. Black's Law Dictionary defines a material fact as "one which constitutes substantially the consideration of the contract, or without which it would not have been made," 881 (5th ed.1979), and this aspect of "materiality" is discussed below in the context of reliance. Viewed solely in the context of Debtor's

total assets and net worth, however, an overstatement of $141,700, which is nearly one-third of both, is certainly substantial and, if viewed only from an accounting perspective, material. As noted below in the discussion of the final element of § 523(a)(2)(B), intent to deceive, there is a real question, however, as to whether Debtor's PFS was in fact materially erroneous. But even assuming that the Debtor's PFS was erroneous in attributing joint ownership to assets held in Cynthia Green's name alone, FirstMerit failed to prove that it reasonably relied upon that misrepresentation.

Brindza was candid in acknowledging that the Imaging Loans were made on the basis of Imaging's business and assets and secured by security interests in its assets. He testified that based on the information furnished to him in mid February, 1996, he was satisfied that the loans were sound based on Imaging's business, prospects and assets. This conclusion was reached without regard to the owners' guarantees or PFS, which were supplied only on the eve of the loan closing. It was clear from Brindza's testimony that the Imaging Loans would not have been made if Imaging's credit or business assets were unsatisfactory or insufficient, regardless of the Debtor's own creditworthiness or personal assets.

In any event, in accordance with FirstMerit's customary practice Brindza, with few exceptions, required guarantees from the owners of his small business borrowers; he had obtained personal guarantees in all but two of 70 such loans in his portfolio at the time he testified. In each case where the loan was guaranteed, it appears Brindza's (and FirstMerit's) practice was to obtain PFSs from the guarantors on the same forms used by Ralph Green and the Debtor. Therefore, it is reasonable to conclude that FirstMerit would not have made the Imaging Loans without the Debtor's guarantee or without a satisfactory PFS from the Debtor and Ralph Green. There is, however, very lit-

tle evidence from which to determine what would have made the Debtor's or Ralph Green's PFS bad enough for Brindza to have aborted otherwise satisfactory loans to Imaging.

If FirstMerit had any minimum requirements or limits for a guarantor's income, assets or liabilities, Brindza did not disclose them to the Debtor in either 1996 or at trial, and there was no evidence of any other small business loans which Brindza or FirstMerit had aborted because of an owner/guarantor's unsatisfactory PFS. Apart from Brindza's testimony that he relied on the Debtor's liquid assets as reflected in the Bank Accounts, there is nothing in the evidence to suggest Brindza would have aborted the Imaging Loans had the Debtor's PFS shown a net worth of $304,000, which would apparently have been accurate after eliminating the Real Estate and Bank Accounts from the Debtor's PFS. The $304,000 net worth would have been in addition to Ralph Green's net worth of $240,000 and neither PFS indicated any material liability or financial problem.

In an effort to bridge this gap in First-Merit's proof, Brindza testified that he gave particular weight to the $101,700 of Bank Accounts shown on the Debtor's PFS as a potential source of loan repayment independent of the success of Imaging. In the same testimony he dismissed reliance on the $129,481 in Bank Accounts shown in Ralph Green's PFS because Ralph Green lived in another state, presumably due to the increased difficulty or cost of enforcing Ralph Green's guarantee outside Ohio. For similar reasons, perhaps, he did not stress reliance on the Debtor's claim to a one-half interest in the Real Estate. But even if the PFS had been entirely accurate the Debtor's share of the Bank Accounts would, apparently, have been only $50,850, half of the $101,700 shown. In the Loan Approval Brindza completed on the eve of closing the Imaging Loans, (Df.Ex.2), however, Brindza indicated the full value of all of the assets

shown on the Debtor's PFS, including the Bank Accounts, as belonging to the Debtor. If Brindza had in fact counted on the Debtor's share of the Bank Accounts, it seems unlikely that he would not, at the least, have pinned down the extent of the Debtor's interest. Together with Brindza's other actions in respect of the PFS, this indicates that Brindza was satisfied with a PFS including assets of the Debtor's wife and that his focus on the Debtor's share of those assets was an afterthought.

But even if Brindza in fact relied upon the Debtor having title with his wife to the Bank Accounts and Real Estate, his reliance was not reasonable under § 523(a)(2)(B). In its principal case on reasonable reliance the Sixth Circuit indicated that the adjective "reasonable" in "reasonable reliance" is not so much an independent criterion as assurance that there is reliance in fact:

> [T]he decisions teach only that dischargeability should not be denied where a creditor's asserted reliance would be so unreasonable as to negate any actual reliance.

*Boston Mtg. Corp. v. Ledford (In re Ledford),* 970 F.2d 1556, 1560 (6th Cir.1992); *see also Bomis v. Nat'l Union Fire Insurance Co.,* No. 93–1014, 1994 WL 201885 (6th Cir., May 23, 1994). Notwithstanding according "reasonable" that limited role, the *Ledford* court went on to suggest criteria for determining whether reliance is reasonable.

> Among the circumstances that might affect the reasonableness of a creditor's reliance are: (1) whether the creditor had a close personal relationship or friendship with the debtor; (2) whether there had been previous business dealings with the debtor that gave rise to a relationship of trust; (3) whether the debt was incurred for personal or commercial reasons; (4) whether there were any "red flags" that would have alerted an ordinarily prudent lender to the possibility that the representations relied upon were not accurate; and (5) wheth-

er even minimal investigation would have revealed the inaccuracy of the debtor's representations.

*Id.* (citations omitted). The Supreme Court's decision in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) made clear that reliance was "reasonable" under § 523(a)(2)(B) only if a prudent person in the creditor's position would have relied on the misrepresentation. *Field,* 516 U.S. at 77, 116 S.Ct. at 447. As noted previously, it appears from the evidence that Brindza was content to rely upon the couple's PFS and did not in fact rely on the Debtor's share of joint assets. But if he did rely subjectively on the Debtor having title to half of the Real Estate and the Bank Accounts, his reliance was not prudent in the objective sense required by *Field.*

It is not plausible that a prudent lender would base a lending decision on the Debtor's interest in the Bank Accounts or Real Estate as shown in the Debtor's PFS. Apart from the fact that they were shown as joint assets, the PFS nowhere indicated the Debtor's or his wife's percentage interest in the Bank Accounts. Brindza appears to have assumed that each owned 50 percent, certainly the usual case, but it could have been more or less and still have been joint.

Schedule A to the Debtor's PFS specifically provided a space for designating the "owner" of the Bank Accounts, which was not completed. Similar information on other asset classes was called for and supplied in the Debtor's PFS but only the names of the financial institutions holding the Bank Accounts were shown in his PFS. This lack of detail and specificity in the Debtor's PFS of the very assets First Merit allegedly relied upon would be a red flag to a lender claiming reliance on the Debtor's share of the Bank Accounts within the meaning of *Ledford.* Minimal inquiry or investigation would have elicited the names in which the Bank Accounts were held.

In addition, FirstMerit's reliance looks equally unrealistic under other *Ledford* criteria. The Imaging Loans were the first contact between Brindza and the Debtor. There was no familiarity or trust in their relationship which entitled Brindza to ignore circumstances surrounding the ownership of the Bank Accounts or the Real Estate. Brindza appeared to be an intelligent, experienced and conscientious loan officer. His failure to request a guarantee from Cynthia Green, an individual PFS from the Debtor or additional information as to the jointly owned assets in response to the joint PFS furnished by the Debtor, is persuasive evidence that Brindza was satisfied to rely on a PFS showing that the Debtor and his wife had substantial assets, which they did, in support of the Debtor's unsecured guarantee.

The last element FirstMerit is required to prove under § 523(a)(2)(B) is that the Debtor intended the misinformation in the PFS to deceive Brindza and FirstMerit. Certainly the evidence is clear that the Debtor knew at the time he filled out the PFS and delivered it to Brindza that title to the Real Estate was in his wife's name as were the Bank Accounts. There are, however, several reasons to question the significance of this fact.

FirstMerit's PFS form is none too clear. Although it provided for the inclusion of joint assets, it provided no obvious place or method for the person other than the guarantor, the "other party" referred to in the form, to designate and identify her separate assets, although the form called for a description of the "other party" in section 2 of the PFS and for her signature only if the guarantor intended to rely upon her assets.

The Debtor filled out the "Other Party Information" called for in section 2 and both the Debtor and his wife signed the PFS. It is, of course, possible that this was part of an elaborate scheme to mislead FirstMerit but this seems unlikely. As noted above there is no evidence of any communication from FirstMerit to the

894

Debtor that some minimum amount of assets, liquid or otherwise, would be required to support his guarantee. If, as FirstMerit suggests, the Debtor's intent was to shield assets he had transferred to his wife, he defeated that purpose by having her certify on the PFS that he had a joint interest in property in her name.

Property ownership between husband and wife is not determined by an action as simple as locating legal title in one spouse or the other. Domestic relations courts treat property as jointly owned in both spouses, even if legal title is in one spouse, unless that spouse can prove that the property was acquired with his or her separate assets, and therefore is not marital property. 45 O.Jur.3d, *Family Law* § 461 (1994). Had the Debtor claimed an equitable interest in the Real Estate or the Bank Accounts despite legal title in his wife Cynthia, the claim would not only have been entirely plausible but, having certified in the PFS her husband's joint ownership, Cynthia Green could not very well have disputed his interest.

There could be, however, good reason why the Debtor made no such claim in this proceeding. In filing his individual bankruptcy in 1999 the Debtor (and his wife) could have found it advantageous to locate the equitable interest in the wife. As questionable as such a decision may have been, it does not prove an intent to deceive on his, or his wife's, part in furnishing the PFS to First Merit in 1996.

In summary, FirstMerit has failed to prove the elements of a nondischargeable under § 523(a)(2)(B) of the Bankruptcy Code.