In re Harold G. CHAMBERLAIN, III Paula J. Chamberlain, Debtors.

John R. Carson Karla E. Carson, Plaintiffs,

v.

Harold G. Chamberlain, III Paula J. Chamberlain, Defendants.

Bankruptcy No. 02–63737.
Adversary No. 03–2056.

United States Bankruptcy Court, S.D. Ohio, Eastern Division.

Sept. 26, 2005.

Mark W. Iannotta, Esq., Strip Hoppers Leithart McGrath & Terlecky Co., LPA, Columbus, OH, for Plaintiffs.

Marshall D. Cohen, Esq., Marshall D. Cohen Co., LLC, Columbus, OH, for Defendants.

### MEMORANDUM OPINION AND ORDER

CHARLES M. CALDWELL, Bankruptcy Judge.

This Memorandum Opinion and Order constitutes the Court's findings of fact and conclusions of law regarding the dischargeability proceeding commenced on behalf of John R. and Karla E. Carson ("Plaintiffs") against Harold G. and Paula J. Chamberlain, III ("Defendants"). The dispute is based upon a failed merger of two computer-related businesses. The Plaintiffs seek to block the discharge on the basis that the Defendants provided financial information that misrepresented the value of stock in Garrison Enterprises, Inc. ("Garrison"). The Plaintiffs assert that this false information induced them to merge in violation of Section 523(a)(2)(B) of the United States Bankruptcy Code ("Code"). The Court has determined that the Plaintiffs have failed to sustain their burden of proof by a preponderance of the evidence. A brief summary of the facts will illustrate the basis for this decision.

The Plaintiffs and Defendants were both husband and wife teams that ran small computer-related businesses in Ohio and West Virginia. The Plaintiffs owned Preeminence, Inc. ("Preeminence") that also did business as The Computer Network

("TCN") and AlphaLink ISP ("AlphaLink"). Preeminence sold and installed computers, and provided customer service. Preeminence was owned by four partners, including the Plaintiffs, Beverly Harris ("Ms. Harris") and Robert F. Hendricks ("Mr. Hendricks"). In 1999, the Plaintiffs, through Preeminence, acquired a 50% interest in AlphaLink that was an Internet service-provider. WCLT Radio, Inc. ("WCLT"), a Newark, Ohio radio station, owned the remainder of the interest.

The Defendants owned Eagle Technologies Group, Inc., ("Eagle") along with Shawn P. and Lisa R. Harnett ("Harnetts"). Eagle's business was substantially similar to the Plaintiff's companies. It was headquartered in Marietta, Ohio. In March 2000 Eagle merged with SnL Computer and Web Design, L.L.C. located in Clarksburg, West Virginia that was owned by the Harnetts.

The Plaintiffs and the Defendants first met between 1985 and 1986 when they attended a sales incentive trip. With this approximately fifteen-year relationship, the Plaintiffs and the Defendants developed trust and respect. Their relationship grew to the point that on multiple occasions the parties considered merging. The first significant merger discussions were initiated in the Fall of 1998. There was no exchange of financial information. The Defendants met with their staff to discuss the possibility, but decided not to merge.

Two years later in May 2000, merger discussions were initiated by the Plaintiffs at an industry meeting. Four months later in September 2000, the Plaintiff John R. Carson ("Mr. Carson") expressed to the Defendants that Preeminence was entertaining an offer from another company to acquire their business, and he urgently sought a status report on the Defendants' interest in merging. The parties exchanged financial information. Specifical-

ly, the Defendant, Harold G. Chamberlain, III ("Mr. Chamberlain") testified that he provided the Plaintiffs with financial statements and tax returns.

Mr. Chamberlain testified that in September 2000 he also began discussions with a Mr. Cameron N. Garrison ("Mr. Garrison"). Mr. Garrison is his nephew, and the primary shareholder of Garrison that is located in Charlotte, North Carolina. Garrison marketed health reports for daycare centers and restaurants, and was interested in retaining Eagle to migrate their services to the Internet. At that time Garrison had been in business for approximately one year. Approximately one month later, on October 18, 2000, a merger meeting was conducted involving the Plaintiffs, the Defendants and the Harnetts. At that time there was no formal arrangement with Garrison. It was not on the agenda, and was not discussed at the merger meeting according to Mr. Chamberlain. At the end of the October 18, 2000, meeting the parties agreed to merge. It was not until approximately a month later on November 1, 2000, that a contract was executed between Garrison and Eagle.

There is no dispute that the essential arrangement between Eagle and Garrison was for the construction and maintenance of the Internet-based health reports in exchange for stock. There is some dispute, however, as to the value of the Garrison stock and how it was derived. Mr. Chamberlain testified that the value of $300,000.00 was ascribed to the stock based upon a board resolution of Garrison. The resolution, that was executed by Mr. Garrison as Director, indicates that the services of Eagle were determined to have a value of $300,000.00, and that in exchange, 5,000 shares were to be issued at the price of $60.00 per share. Mr. Chamberlain testified that the valuation was given to him by Garrison after discussion with

its counsel and accountants. Also, Mr. Chamberlain testified that Mr. Garrison personally expressed to him the value of $300,000.00.

Mr. Chamberlain testified that his accountant suggested that since the arrangement with Garrison was finalized in November 2000, that a portion of the stock should be valued in the amount of $225,000.00 for the year 2000 and $75,000.00 for the year 2001. Mr. Chamberlain testified that he did not think that the value of the shares was a material factor in the merger because it was never discussed by the parties in their meetings leading up to the merger. Rather, Garrison was treated simply as another project.

Mr. Chamberlain testified that the stock value was premised upon successful completion of the project and the provision of ongoing support and maintenance. While the sites for the restaurant and day care center reports were launched in the Summer of 2001, he estimates that the project was only 80% complete. Mr. Chamberlain testified that about $200,000.00 to $250,000.00 worth of work was performed on the Garrison project. He thought that the stock would be worth $300,000 if the project was successfully completed. Mr. Chamberlain testified that he had no intention to deceive. Mr. Chamberlain testified that while the value was speculative, he never thought that the shares had no value. In retrospect, however, he testified that given the project completion rate, that the value of the shares should have been spread over a longer period.

Mr. Garrison offered a different view on the how the stock valuation was derived. He testified that the $300,000.00 valuation was based upon what the Defendants wanted their investment to be worth in five to ten years, and what they determined their services were worth. Based upon this Mr. Garrison testified, that in

consultation with his attorney, the number of shares to be given to the Defendants was determined.

According to Mr. Garrison at the time of the discussions on the transfer of stock to Eagle, Garrison had 100,000 outstanding shares, and 95,000 shares were initially held by Mr. Garrison and his spouse. In addition to the 5,000 shares issued to Eagle, at some point 2,518 shares were sold to third parties at the price of $85.39 per share. Garrison, however, was never listed on any exchange. Mr. Garrison testified that at the time the shares were issued they were not worth anything because Garrison had no assets, and it was a matter of speculation premised upon events going as planned. Mr. Garrison testified that he fully disclosed to all investors that Garrison was a start-up with no present value but with growth potential, and that he conveyed this same information to Mr. Chamberlain.

The Plaintiffs assert that they relied upon the ownership of the Garrison stock in making their merger decision. Specifically, the Plaintiff Karla E. Carson ("Ms. Carson") testified that the Plaintiffs agreed to take less stock in the merger given the fact that Eagle appeared to have more value. Ms. Carson testified that they relied upon financial data provided by the Defendants that ascribed a value of $300,000.00 to the Garrison stock. According to the testimony of the Plaintiff, John R. Carson ("Mr. Carson") the value of the Garrison stock was the reason the Plaintiffs agreed to personally guarantee some obligations.

Mr. Carson testified that between the years of 1999 to 2001 the Plaintiffs downsized their business from 35 to 16 employees due to a loss in sales. Also, he testified that during its last year Preeminence did not earn a profit. According to the testimony of Mr. Chamberlain, as of Feb-

ruary 2001, Eagle had projects valued at $650,000.00, but that sum included the value of the Garrison contract. The December 31, 2000, balance sheet of Eagle showed year-to-date net income of $161,720.69, but this figure included the Garrison stock valued at $300,000.00. Without this sum there would have been a loss of $138,279.31.

After the Plaintiffs and Defendants agreed to merge, they consulted with an attorney, Jeffrey E. Fromson ("Mr. Fromson"), who was obtained through a prepaid legal services plan. During the parties' initial meeting with this attorney, however, there was no discussion of the Garrison shares. Mr. Fromson was not called as a witness by any of the parties regarding their merger discussions and any significance of the Garrison shares.

Simultaneously, the parties began their efforts to obtain financing. They wanted to borrow one million dollars, and they approached five banks, including Bank One of Marietta, Huntington National Bank of New Albany, People's Bank, Park National Bank and Bank First National of Newark ("First National"). First National worked most closely with the parties, but at the beginning of lending discussions it indicted that the merged entity would only qualify for a loan of approximately $700,000.00. Mr. Chamberlain testified that even this amount was not enough to cover all of the obligations of the merged entity.

The Defendants had a banking relationship with People's Bank, and the Plaintiffs had a banking relationship with Park National Bank. Despite these relationships, the parties were not able to obtain financing from those institutions. Park National had been approached not only to provide additional financing but to also take out Mr. Hendricks who did not want to be part of the merged entity. Mr. Carson testified that Park National indicated that the two

companies together were not strong enough to sustain the loans without the Hendricks guarantee.

The Plaintiffs and the Defendants supplied and exchanged financial information of their companies for the purpose of presenting a business plan to potential lenders. They worked on preparing a combined financial statement, and the financial records indicated that the Plaintiff's companies were experiencing losses. Specifically, the combined balance sheet for the merged entity showed that as of December 31, 2000, AlphaLink had a loss of $1,259.76, and TCN had a loss of $69,054.20. On the combined balance sheet Eagle showed a profit of $84,056.89, but this sum included the value ascribed to Garrison. The Garrison stock was treated as an asset valued at $300,000.00 in the business plan, and was treated this same way in financial reports of Eagle that were used to create the business plan.

The parties were not able to obtain a loan from any of the five institutions. They only obtained tentative verbal approval from First National, but before it was finalized, the parties were required to prepare a worst case scenario. This document does not contain any reference to any potential sale of the Garrison stock. On April 30, 2001, the parties received a rejection letter from First National. The rejection identified that the business plan was, "too heavily reliant upon projections."

Even while in the process of obtaining financing the parties began merging their operations, and began working on projects together. Also, the Plaintiffs were engaged in efforts to obtain 100% ownership of Preeminence to complete the merger. The Plaintiffs purchased the shares of Ms. Harris for the sum of $26,000.00, and this transaction was treated as a shareholder loan for the merged entity. The Plaintiffs also paid WCLT $50,000.00 to acquire its

shares. Also, during this period the parties decided to switch attorneys, because they were not pleased with the progress of the work and the charges. They selected an attorney, C. Arthur Morrow ("Mr. Morrow"), who had previously represented the Plaintiffs. Mr. Morrow, however, was not called as a witness by any of the parties regarding the merger discussions and in particular the significance of the Garrison shares.

The Merger Agreement, executed by the parties on or about April 30, 2001, contained no reference to the interest in Garrison. Specifically, Paragraph 4.11 details that, "Eagle does not own, directly or indirectly, any equity or other ownership interest in any corporation, partnership, joint venture or other entity or enterprise." Mr. Chamberlain testified that he did not notice at the time of signing that this inaccurate representation was included. This same omission was made with regard to Preeminence in the Merger Agreement. Some testimony from the drafting attorney, Mr. Morrow, would have been particularly helpful in view of these omissions.

Mr. Chamberlain testified that the parties decided to proceed with the merger without outside financing, because they felt that the banks did not understand their business, and that they could piece together financing from their personal resources. Mr. Chamberlain testified, however, that without the financing the merged company was undercapitalized at its inception. Mr. Chamberlain also testified that between March 2001 and December 2001 the Defendants paid approximately $150,000.00 into the merged entity based upon a home equity line of credit. Also, the Defendants obtained from People's Bank a $50,000.00 extension on their line of credit for sixty days.

The ownership structure of the merged entity included the Defendants holding 50% of the stock, the Plaintiffs 30%, the Harnetts 12%, and the balance of 8% was distributed to Mr. Hendricks. The split of stock between the Plaintiffs and the Defendants was based upon the sales and debt levels of the merged companies, and only Eagle survived. Mr. Hendricks received shares because Park National Bank was unwilling to continue the Plaintiffs' line of credit without Mr. Hendricks' involvement and continued guarantee in the merged entity.

Given the inability to obtain outside financing, the reduction of expenses through combining and streamlining operations was essential, according to Mr. Chamberlain. He testified that a week after the execution of the Merger Agreement a conflict arose with Ms. Carson. The dispute concerned his efforts to merge the accounting functions. Mr. Chamberlain testified that he also unsuccessfully tried to obtain the cooperation of the Plaintiffs in merging purchasing and inventory management. Due to the inability to streamline, Mr. Chamberlain testified that the merged entity lost $400,000.00 in profits during the first five months, primarily due to excess overhead and operating inefficiencies.

According to Mr. Chamberlain other problems arose, including the undue delay in the phone system installation to link the offices, and all of the officers continued to collect salaries without any reduction in staff as originally intended. The Plaintiffs drew combined salaries in the amount of $100,000 per year. They also had health and life insurance, and they received payments for a Jeep. The Defendants drew similar salaries. Also, Mr. Chamberlain testified that the Plaintiffs hired back two employees without his prior knowledge. Mr. Harnett took over the Garrison pro-

ject, but made it a lower priority after the merger. Mr. Chamberlain testified that although they discussed additional capital from the partners, the Plaintiffs and the Harnetts did not place any personal funds in the merged entity. Mr. Carson, confirmed that the Plaintiffs made no monetary contribution after the merger.

On September 18, 2001, a mere five months after the execution of the Merger Agreement, Ms. Carson recommended the liquidation of the Garrison shares in view of the losses. The parties, however, decided on September 26, 2001, to reverse the merger. As part of the reversal, that was finalized in December 2001, AlpahaLink was spun off to the Plaintiffs as a tax-free exchange along with the related furniture and equipment. Eagle assumed most of the debts of the merged entity, including the separation costs. The receivables, inventory and client lists of AlphaLink remained with Eagle.

■ The Plaintiffs seek to block the discharge pursuant to section 523(a)(2)(B) of the Code.[1] They must prove all of the elements of their cause of action by a preponderance of the evidence, and dischargeability exceptions are strictly construed against creditors. *Giant Eagle, Inc., et al. v. Monus (In re Monus)*, 294 B.R. 707, 713 (Bankr.N.D.Ohio 2003); *Insouth Bank v. Michael (In re Michael)*, 265 B.R. 593, 597 (Bankr.W.D.Tenn.2001); *FirstMerit Bank, N.A. v. Green (In re Green)*, 240 B.R. 889, 891 (Bankr.N.D.Ohio 1999); *Fifth Third Bank v. Collier (In re Collier)*, 231 B.R. 618, 623 (Bankr.N.D.Ohio 1999).

■ Five elements must be established: 1) that a statement in writing was used; 2) that the written statement was materially false; 3) that the false written statement related to the debtor's or an insider's financial condition; 4) that the creditor reasonably relied; and 5) that the written statement was made or published with intent to deceive. *In re Monus,* at 713.

■ The document must have been written by the debtor, signed by the debtor, or written by another but adopted and utilized by the debtor. *Bellco First Federal Credit Union v. Kaspar (In re Kaspar)*, 125 F.3d 1358, 1361 (10th Cir.1997), (citations omitted). A written statement is materially false if, "... the information offers a substantially untruthful picture of the financial condition of the debtor that affects the creditor's decision to extend credit." *In re Michael,* at 598. It has been held that an omission, concealment or understatement of liabilities may constitute a materially false statement. *In re Collier,* at 623.

■ The information must not only be substantially inaccurate, it must also involve information that affects the thought process. *In re Collier,* at 623. To be actionable the written statement must in some manner, "... describe the debtor's net worth, overall financial health, or ability to generate income." *Skull Valley Band of Goshute Indians v. Chivers (In re Chivers)*, 275 B.R. 606, 615 (Bankr.D.Utah 2002). Documents such as tax returns,

---

**1.** Section 523(a)(2)(B) provides in relevant part as follows:
   (a) A discharge under section 727... does not discharge an individual debtor from any debt—
   (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—
   (B) use of a statement in writing—
   (i) that is materially false;
   (ii) respecting the debtor's or an insider's financial condition;
   (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and
   (iv) that the debtor caused to be made or published with intent to deceive;...

balance sheets and income statements that demonstrate net worth, financial health or the ratio between assets and liabilities, are sufficient. *Melhorn v. Copeland (In re Copeland),* 291 B.R. 740, 783 (Bankr. E.D.Tenn.2003).

■ Regarding the reasonable reliance standard, as a threshold the creditor must establish that it actually relied on the written statement prior to taking action, compared to situations where the creditor is persuaded by other factors, such as the debtor's reputation and enthusiasm for the project. *First National Bank of Centerville Tennessee v. Sansom (In re Sansom),* 224 B.R. 49, 54–55 (Bankr.M.D.Tenn.1998); *Steier v. Best (In re Best),* 109 Fed.Appx. 1, 9–11 (6th Cir.2004).

■ Next, regarding written statements compared to oral statements, that are governed by section 523(a)(2)(A) of the Code, the creditor must establish "reasonable" compared to "justifiable" reliance. *In re Copeland,* at 784. This different standard is imposed to exclude creditors who may be acting in bad faith by requiring courts to determine, based under the totality of circumstances, whether the creditor has acted reasonably. *In re Copeland,* at 784–785. The goal is to deny the claim of creditors that disregard obvious inaccuracies and inconsistencies. *In re Michael,* at 600; *In re Morris,* 223 F.3d 548, 554 (7th Cir.2000). The factors considered to establish reasonable reliance include: a) the existence of prior contacts and transactions that allow for the development of a relationship of trust; b) the existence of any "red flags" that would alert an ordinarily prudent person that the representations were inaccurate; and, c) whether a minimal investigation would have exposed the inaccuracies. *In re Copeland,* at 785.

■ By a preponderance of the evidence creditors must show that the debtor intended to deceive or was grossly reckless as to the accuracy of the written information. *In re Sansom,* at 56–57; *Investors Credit Corp. v. Batie (In re Batie),* 995 F.2d 85, 90 (6th Cir.1993). Intent to deceive may be inferred from the circumstances surrounding the transactions, but all doubts must be resolved in favor of the debtor. *In re Collier,* at 626. An inference arises where no effort is made to verify the accuracy of the written statement, or where there was no reasonable basis to conclude that the statement was accurate. *In re Copeland,* at 787. The goal is to discern whether the circumstances and the debtor's actions are inconsistent with the assertion of lack of intent. *In re Copeland,* at 787

The Court has concluded that this is not a case of fraud, but rather an instance of a failed business relationship. The failure was caused by the fact that the businesses that were merged were not in the most healthy condition during a time that the computer industry was in decline. The merged company was undercapitalized, and this deficiency was exacerbated by the inability to fully integrate operations and reduce expenses.

There is no dispute that the written statements with respect to Eagle's financial condition were issued as contemplated by section 523(a)(2)(B) of the Code. Various financial statements were exchanged and created in preparation for the merger that related to the financial condition of Eagle. Eagle is considered an insider for purposes of this dischargeability provision pursuant to section 101(31)(A)(iv) of the Code. The Plaintiffs, however, have failed to prove by a preponderance of the evidence the three remaining elements: 1) that the statements were materially false; 2) that they reasonably relied upon the

statements; and, 3) that the statements were issued with intent to deceive.

■ Regarding the element of material falsity, there is some difference between the testimony of Messrs. Chamberlain and Garrison regarding how the Garrison stock was valued, and indeed whether it had any value at all. In the context of the start-up of a company it is difficult, however, to determine whether the $300,000.00 value was materially false. No expert valuation testimony was provided. The stock was never listed on any exchange, but other parties purchased 2, 518 shares at the price of $85.39 each.

Mr. Chamberlain credibly testified that the value ascribed was related to the economic worth of the services to be supplied by Eagle. As in any new venture, had events gone as plan the stock could have been worth $300,000.00, or more. All of these factors lead the Court to conclude that while the value may have been speculative, and while perhaps the value should have been spread over several years, the Court cannot find and conclude that the value ascribed was materially false.

■ Turning to the element of reasonable reliance, as the case law indicates the inquiry is twofold. First, there must be actual reliance. Second, that reliance must be reasonable under the circumstances. The Plaintiffs have failed to prove by a preponderance of the evidence that they actually relied, and if so, that their reliance was reasonable. The Court concludes that the Plaintiffs were motivated to merge, not based upon the value of the Garrison stock, but rather based upon their fifteen years of personal and professional acquaintance with the Defendants.

The Plaintiffs and Defendants were both husband and wife teams in the computer industry, they met at trade meetings and developed a significant element of trust in their respective abilities. In addition, the Court concludes that the Plaintiffs, who at points initiated the merger discussions, were motivated by the health of their business, the fact that they had other potentially interested parties, and the fact that they saw advantages to merging their operations. The Garrison stock is not even mentioned in the Merger Agreement. While the Garrison investment may have been significant for all parties, the value of its stock was not the point. Rather, the Garrison relationship was treated as another project. The value only became an issue when post merger operations failed to generate proceeds sufficient to sustain their business.

■ Even if the Plaintiffs had actually relied on the stock value, they have failed to prove by a preponderance of the evidence that their reliance was reasonable. The Plaintiffs and the Defendants were equally well situated to protect their interests in the merger. All of the parties had significant experience in the computer industry, and they had run their own companies for approximately the same number of years. They were equally sophisticated and equipped to scrutinize financial information that they exchanged and prepared together for purposes of obtaining financing. They all had the ability to make sure that what they were collectively telling lenders was true and that the merged entity would be financially viable. The Plaintiffs had more than ample opportunity to question the value of the Garrison stock, or to even question why its existence was not reflected in the Merger Agreement they signed.

■ Regarding the final element of intent to deceive, as with the case of material falsity, there was a logical basis used to derive the value of the stock. It was based upon the worth of the work performed. The value was spread over two years based upon the advice of the Defendants' accountant. Yes, in retrospect per-

haps the value should not have been recognized so aggressively. Such hindsight does not amount to intent to defraud or behavior that may be deemed as a reckless disregard for the accuracy of the information.

The Court cannot discern any benefit the Defendants would derive by providing false information to induce the Plaintiffs to merge. The Defendants were fully invested in the merger to a degree unlike any of the other parties. After no bank would provide the requisite capital, post merger the Defendants invested $150,000.00 based upon a home equity line of credit. They also obtained a $50,000.00 extension on a commercial line of credit. Such behavior is not indicative of parties with an intent to deceive or parties that issue financial information with a reckless disregard.

For all of these reasons the Court has determined that the Plaintiffs have failed to establish their burden of proof by a preponderance of the evidence. Accordingly, the obligation is discharged.

**IT IS SO ORDERED.**